**REINKE MANUFACTURING COMPANY, INC., Plaintiff,**

v.

**SIDNEY MANUFACTURING CORPORATION, Defendant.**

**Civ. No. 76–L–137.**

United States District Court, D. Nebraska.

March 8, 1978.

---

Carter H. Kokjer, Kansas City, Mo., William P. Mueller, Ogallala, Neb., for plaintiff.

Dennis L. Thomte, Omaha, Neb., for defendant.

## MEMORANDUM

DENNEY, District Judge.

This matter is before the Court for decision after trial to the Court and submission of written final arguments. Plaintiff is the assignee of United States patent No. 3,608,-826 [the '826 patent] and No. 3,750,953 [the '953 patent] issued to Richard F. Reinke on September 28, 1971 and August 7, 1973. Richard F. Reinke is the Chairman of the Board and major shareholder of Reinke Manufacturing Company, which is principally engaged in the manufacture and sale of the "Electrogator," a circular irrigation system embodying the inventions patented by Mr. Reinke.

The defendant was formed in November, 1972. Pursuant to an agreement between Kroy Metal Products of York, Nebraska and Sidney Manufacturing Company in the fall of 1972, defendant is engaged in the manufacture and sale of circular irrigation equipment sold under the name "Kroy."

Plaintiff charges that the design and construction of defendant's machine, "Kroy," infringes claims 4 and 11 of the '826 Reinke patent and claims 1, 3, 4 and 5 of the '953 Reinke patent. Defendant denies infringement of any of the claims and seeks a declaratory judgment concerning the validity of such claims under 35 U.S.C. § 102, § 103 and § 112. Moreover, defendant's counterclaim charges fraudulent procurement of the patents, patent misuse and violations of the antitrust laws.

Jurisdiction and venue are present by virtue of 28 U.S.C. § 1338(a) and § 1400(b).

In accordance with Fed.R.Civ.P. 52(a), the Court makes the following findings of fact and conclusions of law:

1. Both of defendant's "Kroy" models infringe all of the claims in issue in this lawsuit, if the patents are valid.

2. The patent specifications comply with 35 U.S.C. § 112, and the patents are not invalid for inadequate disclosure.

3. The patented invention was not in public use or on sale in this country more than one year prior to Richard Reinke's applications for such patents, 35 U.S.C. § 102(b).

4. Defendant failed to prove essential elements of its claims of fraud, patent misuse, monopolization and restraint of trade. The patents are not invalid on these grounds, and judgment on defendant's antitrust counterclaim will be entered in favor of the plaintiff.

5. Defendant has sustained its burden of establishing that claims 4 and 11 of the '826 patent and claims 1, 3, 4 and 5 of the '953 patent are invalid for obviousness under 35 U.S.C. § 103.

The subject of the Reinke patents is an electrically driven circular irrigation system in which the water pipe carrying sprinkler heads serves as part of a traveling sectional boom. One end of the boom is connected to a stand assembly positioned in the center of a square area to be irrigated. The boom moves in a circular path around the stand assembly. Such machines are generally known as center pivot irrigation systems, because the boom carrying the sprinkler heads travels around the central stand or pivot location containing the water supply pipe.

In the Reinke patents, the boom is propelled in a circular path by electrically driven wheeled towers, i. e., "drive units," spaced at intervals. The wheel assemblies also provide support so that the boom is maintained in a straight line as it rotates. The boom itself consists of the water pipe and a supporting truss assembly underneath and interconnected with the water pipe.

Generally, the truss is constructed as follows [Exhibits 1 and 2]. The water pipe forms the top chord of the truss, and the bottom or tension chord is formed by cables or tie rods. On either side of the water pipe, brace chords in the shape of a "V," attached to the pipe at the upper ends of the V, extend downward with the apex of each V connected to a bottom or tension chord. The V braces form the web members of the truss. A transversely extending brace, or connector bar, is attached to the apices of the V's at the points where the apices are fixed to the bottom or tension chords. Figure 14 of the patents, reproduced in the Appendix, illustrates the configuration of the trussed pipe.

## THE CLAIMS

The parties primarily directed their argument and evidence to those elements of the claimed structure which describe the geometry and construction of the trussed pipe. The claims at issue teach in pertinent part:

### The '826 patent

### Claim 4:

An irrigation apparatus comprising an elongated pipe having a plurality of water discharge means thereon . . . said pipe being constructed of a plurality of sections, means articulately connecting the sections together . . . and means responsive to the angulation of one section of pipe in relation to another . . . said elongated pipe including a truss structure disposed along the undersurface thereof between the wheeled means, said structure including a plurality of pairs of V-shaped braces having the upper ends connected to the pipe in longitudinally spaced relation with the braces in each pair depending downwardly in converging relation to each other and in diverging relation to the braces in an opposed pair, means interconnecting the apices of the pairs of braces to retain them rigidly in spaced-apart relation, and

tension rods connected longitudinally of the apices of the braces along each side of the pipe with the ends thereof being connected to the pipe at the end of each section thereof thereby rigidifying and supporting the pipe.

*Claim 11:*

. . . that improvement comprising a supporting truss structure for the pipe including a plurality of longitudinally spaced brace assemblies fixed to said pipe and depending therefrom, each brace assembly including a pair of opposed brace members of V-shaped configuration having the upper ends thereof attached to the pipe and depending in diverging relation, means retaining the lower apices of opposed pairs of brace members in spaced relation, and tension members connected to the apices of said brace member and extending and attached to the pipe at remote points for rigidifying the pipe and forming a truss support therefor.[1]

*The '953 patent*

*Claim 1:*

. . . that improvement comprising a supporting truss structure for the pipe including a plurality of longitudinally spaced brace assemblies fixed to said pipe and depending therefrom, each brace assembly including a pair of opposed brace members of V-shaped configuration having the upper ends thereof attached to the pipe and depending in diverging relation means retaining the lower apices of opposed pairs of brace members in spaced relation, and tension members connected to the apices of the brace members and extending and attached to the pipe at remote points for rigidifying the pipe and forming a truss support therefor, said pipe being sectional with the sections being joined by abutting end flanges, said tension members being attached to the pipe by extending through and being secured to a pair of abutting flanges.

1. In the printed '826 patent, a line was erroneously omitted from Claim 11 which error has been cured by a letter dated July 15, 1977 from

*Claim 3:*

. . . that improvement comprising a supporting truss structure for the pipe including a plurality of longitudinally spaced brace assemblies fixed to said pipe and depending therefrom, each brace assembly including a pair of opposed brace members of V-shaped configuration having the upper ends thereof attached to the pipe and depending in diverging relation, means retaining the lower apices of opposed pairs of brace members in spaced relation, and tension members connected to the apices of the brace members and extending and attached to the pipe at remove points for rigidifying the pipe and forming a truss support therefor, the upper ends of the brace members being secured to angular clips rigidly affixed to the exterior surface of the pipe.

*Claim 4:*

. . . that improvement comprising a supporting truss structure for the pipe including a plurality of longitudinally spaced brace assemblies fixed to said pipe and depending therefrom, each brace assembly including a pair of opposed brace members having the upper ends thereof attached to the pipe and depending in diverging relation, means retaining the lower ends of opposed pairs of brace members in spaced relation, and tension members connected to the lower ends of the brace members and extending and attached to the pipe at remote points for rigidifying the pipe and forming a truss support therefor, the upper ends of the brace members being secured to clips rigidly affixed to the exterior surface of the pipe, said tension members being attached to the pipe by being secured to flanges on the pipe.

*Claim 5:*

. . . the structure as defined in claim 4 wherein said pipe is sectional with

the Commissioner of Patents and Trademarks. [Exhibit 1].

the sections being joined by abutting end flanges, said tension members extending through and being secured to a pair of abutting end flanges, each of said opposed brace members including two depending members defining a substantially V-shaped configuration having their lower end portions connected with each other and the tension members being connected with the lower end portions of the brace members.

Thus all of the claims in issue have in common an undertruss support for the water pipe composed of a plurality of pairs of V-shaped braces, upper ends fastened to the pipe, apices connected to tension members and separated by a cross bar, tension members attached to the pipe at remote points. Claims 1, 3, 4 and 5 of the '953 patent more particularly describe the methods for securing the various parts of the truss to each other. The sections of pipe are joined by abutting end flanges [Claim 1]. The tension rods extend through pairs of abutting flanges by which they are connected to the pipe at spaced intervals [Claims 1, 3, 4, 5]. The upper ends of the V-braces are secured to angular clips which are attached to the side of the pipe [Claims 3, 4].

## INFRINGEMENT

The defendant has marketed two "Kroy" models, the original design [Exhibit 28] and a modified version [Exhibit 37]. The original design included sectional pipe carrying sprinkler heads and an undertruss with four diagonal brace members, a cross bar and tension members. The web of the truss was composed of identical pairs of braces fixed to either side of the pipe across from each other. A side view of the assembly revealed a pair of braces diverging downward at angles converging toward each other, crossed and held together by a connector plate before the braces converged to an apex. The upper ends of the braces were fastened to the pipe by angle clips welded to each side of the pipe. Thus, from a side view, the pipe, brace and connector plate elements formed an inverted trapezoid,

with the connector plate parallel to the pipe, and the braces converging toward each other at angles which would ultimately cause their lower ends to intersect if the braces had been allowed to extend downward beyond the connector plate. A cross bar fastened to the connector plates kept the pairs of trapezoidal assemblies apart and in fixed relation to each other.

From an end view, the brace elements and cross bar formed a triangular shape identical to the Reinke truss.

Tie rods serving as tension members were interconnected with the brace assemblies at the connector plate locations. The tie rods were fastened to the pipe by flanges at the ends of pipe spans composed of three forty-foot pipe sections, i. e., at each tower or drive unit location.

In 1975, the defendant modified the pairs of braces in its truss structure by fastening the lower end of one of the braces in each pair to the other, thereby forming the shape, from a side view, of a mirror-image Y. The cross bar and tie rods in the modified "Kroy" are attached to the extended lower portion of the long brace below the point of its connection with the shorter brace. Otherwise, the modified "Kroy" model is the same as the original.

▆▆▆▆ In deciding the issue of patent infringement, the Court must first construe the language of the claims to determine whether the accused device falls clearly within such language. *Farmhand, Inc. v. Lahman Mfg. Co.,* 192 U.S.P.Q. 749, 764 (D.S.D.1976), *aff'd,* 568 F.2d 112 (8th Cir. 1978), *citing Graver Tank & Mfg. Co., Inc. v. Linde Air Prod. Co.,* 339 U.S. 605, 607, 70 S.Ct. 854, 94 L.Ed. 1097 (1950). If the accused device is not identical in all respects to the patented invention, the Court next considers whether the claims in issue have been infringed "by equivalent if not literally." *Farmhand, Inc. v. Lahman Mfg. Co., Inc., supra,* 568 F.2d at 115. The "doctrine of equivalents" is based on the principle that "if two devices do the same work in substantially the same way, and accomplish substantially the same result, they are the same, even though they differ in name,

form, or shape." *Decca Ltd. v. United States,* 190 Ct.Cl. 454, 420 F.2d 1010, 1013–14 (1970), *cert. denied,* 400 U.S. 865, 91 S.Ct. 102, 27 L.Ed.2d 104 (1970), *citing Union Paper-Bag Mach. Co. v. Murphy,* 97 U.S. 120, 125, 24 L.Ed. 935 (1877).

In the Eighth Circuit, in order to be considered equivalent, an infringing device must be "substantially identical with the one alleged to be infringed in (1) the result attained; (2) the means of attaining that result; and (3) the manner in which its different parts operate and cooperate to produce that result." *Farmhand, Inc. v. Lahman Mfg. Co., Inc., supra,* 568 F.2d at 115. [Citations omitted.]

As in the Reinke machines, the trussed pipe in both "Kroy" models rests upon a frame composed of dual brace assemblies spaced at intervals. The diagonal braces in both "Kroy" structures, while not strictly forming the sides of an inverted triangle because they are bisected by the connector plates, nevertheless serve the same purpose as the Reinke V-braces in the same way, i. e., to provide longitudinal stability to the truss. The Reinke and "Kroy" truss assemblies are "spatial" structures, i. e., enclosing three-dimensional space. As in the Reinke design, triangulation is built into the "Kroy" systems in three planes, as opposed to "planar" brace systems (triangulated in one plane) found in the prior art. The result obtained by both "Kroy" models is clearly the same as that achieved by the Reinke truss. The diagonal braces prevent deflection between the upper and lower chords of the truss (water pipe and tie rods.) They operate to maintain the position of the pipe in relation to the tie rods, thereby providing support and stiffening of the pipe span, maintenance of pipe alignment and resistance to fracture in each plane in which the diagonals are present.

In both "Kroy" models, the angle clips on the pipe securing the upper ends of the diagonal braces and the use of flanges to connect the tie rods to the pipe are equivalent if not identical to the Reinke machine.

Defendant urges that the absence of "apices" creates a critical structural and functional difference between the original "Kroy" model and the Reinke truss. The Court disagrees. Loren Townsend, Secretary-Treasurer of Sidney Manufacturing Company, testified that the company had built a prototype containing a truss virtually identical to the Reinke design. Upon review of Mr. Reinke's patent application, the company attempted to "design around" the literal language of the Reinke claims by moving the lower ends of the diagonal braces apart and inserting the connector plate. However, despite the change in form and the absence of apices, the system as altered to avoid infringement performed the same as the test model. The witness could not identify any "difference in structural action" between the defendant's original commercial units and its prototype identical to the Reinke design.

Plaintiff's expert witness, James Q. Hossack, professor of civil engineering, testified that there is no significant structural difference in the pipe support mechanisms of both "Kroy" models and the Reinke machine. From a structural standpoint, the arrangement of the components of the "Kroy" systems is identical to the Reinke truss. Moreover, Mr. Hossack had performed mathematical analyses commonly used by structural engineers. His tests revealed that both "Kroy" models function as support for the pipe under various loads and stress conditions in exactly the same way as the Reinke truss structure.

In the modified "Kroy" design, the extended portion of the long brace, i. e., the leg of the $\mathsf{Y}$, is subject to some fatigue or bending and is less efficient than strictly V-shaped braces. However, such reduction in efficiency does not avoid infringement when the structure and function of the accused device are equivalent to those of the infringed machine.

> Infringement is not avoided by making a machine which differs in form but appropriates the principle and mode of operation of the patented machine by the use of the same or equivalent means.

*Swanson v. Unarco Indus., Inc.,* 479 F.2d 664, 670 (10th Cir. 1973), *cert. denied,* 414

U.S. 1076, 94 S.Ct. 593, 38 L.Ed.2d 483 (1973). [Citations omitted.]

■ Based on Exhibits 28, 37, 39, 40 and 41, and the testimony of Loren Townsend and James Hossack, the Court concludes that the results attained by the "Kroy" truss in both models, the means. of achieving such results and the manner in which the components operate to that end are substantially identical to the Reinke truss. Therefore, if the patents are valid, Claims 4 and 11 of the '826 patent and Claim 1 of the '953 patent have been infringed by both "Kroy" models under the doctrine of equivalents. The language of Claims 3, 4 and 5 of the '953 patent is substantially similar to Claim 1, and therefore both of the defendant's models have also infringed those claims.

### VALIDITY

*Adequacy of Disclosure*

Defendant contends that the specifications of both patents lack the degree of specificity required by the first paragraph of 35 U.S.C. § 112.[2] In particular, defendant asserts that the specifications omit the following features of Mr. Reinke's invention:

1. bowing of the water pipe,

2. furrow brace between the tower and undertruss,

and that the following features are inadequately defined:

1. location of the holes in the flanges to which the tie rods are connected,

2. length of the V-braces,

3. whether the V-braces are in tension or compression.

In attempting to distinguish his system from a prior device, Mr. Reinke testified that in his design the water pipe was slightly curved upward or bowed to form a parabola so as to facilitate draining and add clearance. However, plaintiff's expert, Mr. Hossack, explained that arching the water pipe is not a critical feature of the Reinke truss geometry and is not significant structurally. Moreover, the manner in which the truss assembly functions is not affected by whether the pipe is arched or horizontal. The Court concludes that the option of bowing the water pipe, in effect pre-stressing it as an additional factor to counteract the natural tendency of the pipe to sag under its own weight and other loads, is nonessential to the invention and was not required to be described.

Mr. Hossack further explained that the use of a furrow or stabilizer brace[3] to connect each wheel assembly tower with its closest brace assembly is not a part of the trussed pipe configuration and does not operate to support the pipe. The parts of the tie rods, i. e., the bottom chord of the truss, which extend from the tower to the first brace assembly cannot be dispensed with even if a furrow brace is used. Essentially, the furrow braces operate to stiffen and stabilize the wheel assembly towers as they travel over deep furrows. As such, they are an addition to the pipe support structure at issue in this case and are not an integral part thereof. Therefore, the absence of this element in the specifications does not invalidate the claims primarily directed to the truss features.

Mr. Reinke testified that the location of the holes in the pipe flanges to which the tie rods are attached is not structurally significant, although for maximum efficiency, the tie rods should be connected at a position approximately one-third from the base of the flanges. Figure 10 at Sheet 4 of both patents [Exhibits 1 and 2] illustrates the connection between the tie rods and flanges at this point. Therefore, if the location of the holes in the flanges is a

---

2. 35 U.S.C. § 112. Specification.—The specification shall contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and ·use the same, and shall set forth the best mode contemplated by the inventor of carrying out his invention.

3. A furrow brace is illustrated in Exhibit 11 at 14 identified as "tower stiffener."

crucial feature, such location has been adequately disclosed in the drawings.

In his answers to interrogatories [Filings # 22 and # 66], Mr. Reinke indicated that "[t]here is no one optimum length [of the V-braces] which will satisfy all possible systems and pipe sizes." Moreover, "[t]he patent does not undertake to establish the preferred materials. The optimum or preferred tensile strength [of the V-braces] would depend upon the materials used and upon the loads imposed, but it should be at least enough to withstand whatever forces are applied to it without destruction."

■■■ 35 U.S.C. § 112 does not require recitation of dimensions or materials when, as here, the article is described in structural terms with sufficient clarity "to enable any person skilled in the art to which it pertains . . . to make and use" it.

■■■ Furthermore, Mr. Hossack testified that the various components of the trussed pipe must be adapted to each other in light of the particular needs of the user. His opinion that one ordinarily skilled in the structural arts would find the specifications and drawings adequate to enable such person to construct and use the depicted pipe support system was not rebutted by the defendant's witnesses. The Court concludes on the basis of all of the evidence offered that the pipe size, length of the V-braces and length of the tension members are details of construction which need not be specified under Section 112. Particular materials also need not be defined. *See generally, United Tanks, Inc. v. Sears Roebuck & Co.,* 293 F.Supp. 246, 249 (C.D. Cal.1968), *aff'd,* 425 F.2d 270 (9th Cir. 1970).

Melvin Brown, manufacturer of pivot sprinklers including certain items of the pertinent prior art, Mr. Reinke and Mr. Hossack all testified to the effect that any V-brace comprising the web members of a truss will go into tension or compression depending upon the forces exerted as the irrigation system moves over terrain. Mr. Brown explained the principle as follows:[4]

[A] V-brace is nothing more or less, from an engineering standpoint, than a tension when it's being stretched one way and a compression member the other way. When the stress is reversed, then the tension member becomes a compression member, and the compression member becomes a tension member . . ..

■■■ Mr. Reinke was not required to specify the exact manner from an engineering point of view in which the components of his machine respond and adapt to the loads imposed in order to teach the world how to construct and use his invention. The specifications recite the structural relationship of the truss parts and the function of the whole in sufficient detail to meet the requirements of 35 U.S.C. § 112.

*Prior Public Use*

35 U.S.C. § 102(b) provides that

A person shall be entitled to a patent unless . . . (b) the invention was . . . in public use or on sale in this country, more than one year prior to the date of application for patent in the United States . . ..

■■■ The "critical date," i. e., one year prior to Mr. Reinke's initial patent application[5] was January 17, 1968. Under § 102(b), a single public use or sale of the device prior to the critical date invalidates the patents. *In re Yarn Processing Patent Validity Litigation,* 498 F.2d 271, 277 (5th Cir. 1974), *cert. denied,* 419 U.S. 1057, 95 S.Ct. 640, 42 L.Ed.2d 654 (1974).

In the fall of 1967, Mr. Reinke constructed a prototype of his irrigation equipment approximately 100 yards south of his main factory building near Deshler, Nebraska. Subsequently, the first Electrogator was sold to Chris Houtwed in April, 1968 [Exhibit 104] and was demonstrated to the public on June 8, 1968 [Exhibit 135].

---

**4.** Transcript Vol. II at 116.

**5.** The applications maturing into the '826 and '953 patents were divisional applications.

Therefore, the latter patent is entitled to the filing date of the original application for purposes of 35 U.S.C. § 102(b). *See* 35 U.S.C. § 121.

The prototype, three towers in length, was a functional machine movable around the center pivot and capable of sprinkling water. The ten-tower system sold to Mr. Houtwed was essentially an extension of the prototype.

Defendant claims that because the prototype was visible from a gravel road 900 to 1000 feet away and because Mr. Reinke's employees observed its operation, the equipment was on public display and thus "in public use" prior to January 17, 1968.

 This conclusion is unsupported by the record. Public use is "any non-secret use of a completed and operative invention in its natural and intended way . . . . open to the public or where any member of the public can see it if such a member so desires." *FMC Corp. v. F. E. Myers & Bro. Co.*, 384 F.2d 4, 9 (6th Cir. 1967), *cert. denied*, 390 U.S. 988, 88 S.Ct. 1183, 19 L.Ed.2d 1291 (1968). However, the requirement of secrecy must be tailored to some extent to the invention. Mr. Reinke testified that he could not find a building large enough to house the model and in which to test it. That he failed to shroud the machine, construct a building around it or take other elaborate precautions to ward off the public does not indicate open access to the machinery, particularly as the prototype was built in a reasonably remote location. There is no evidence that Mr. Reinke ever displayed the model to visitors or potential buyers. Nor was the prototype ever used to irrigate crops.

In addition, the Court finds that the prototype was used for purely experimental purposes. The experimental use doctrine "allows an inventor a reasonable period of experimentation wherein he may perfect his ideas, provided that the inventor truly has utilized the public use or sale to that laudatory end, not as a competitive tool to exploit his invention and gain an advantage over others." *Paeco, Inc. v. Applied Moldings, Inc.*, 562 F.2d 870, 874 (3rd Cir. 1977). "A bona fide experimental use does not place the invention in public use within the meaning of the statute even though the

invention on experiment proves complete and requires no modification or change." *In re Yarn Processing Patent Validity Litigation, supra*, 498 F.2d at 277. "Whether a use is primarily for the purpose of experimentation is primarily a matter of the inventor's intent." *Id.* at 278. Mr. Reinke's uncontroverted testimony that he built the prototype for the sole purpose of testing it is corroborated by the absence of any evidence of commercial exploitation of the product until April, 1968.

*Fraud, Monopolization*

Defendant contends that Richard Reinke deliberately withheld information of pertinent prior art[6] from the Patent Office in the course of applying for the '826 patent and that the Patent Office would not have issued the '826 patent had it been aware of such prior art.

 A patent applicant's violation of his "uncompromising duty" to report to the Patent Office all relevant information which could affect the outcome of his application provides a defense to subsequent enforcement of the patent. The defense of fraud in procurement of a patent is similar to the equitable doctrine of unclean hands. *See Pfizer, Inc. v. Int'l Rectifier Corp.*, 538 F.2d 180, 185 (8th Cir. 1976), *cert. denied*, 429 U.S. 1040, 97 S.Ct. 738, 50 L.Ed.2d 751 (1977), *citing Precision Instrument Mfg. Co. v. Automotive Maintenance Mach. Co.*, 324 U.S. 806, 814, 65 S.Ct. 993, 89 L.Ed. 1381 (1945).

 However, fraudulent procurement or other misconduct before the Patent Office must be established by " 'clear unequivocal and convincing' evidence." *Pfizer, Inc. v. Int'l Rectifier Corp., supra*, 538 F.2d at 186–87.

A patentee's oversights are easily magnified out of proportion by one accused of infringement seeking to escape the reach of the patent by hostilely combing the inventor's files in liberal pretrial discovery proceedings. Unjustified damage

---

**6.** Mr. Reinke failed to cite the "Raincat" device, described *infra*, page 1069.

to professional and social reputations can result, as here, without fostering any corresponding public benefit in the form of inhibiting future improvident grants of patent monopolies.

*Id.* at 196.

Therefore, the charge of fraud must be supported by sufficient evidence of wrongdoing.

> [T]he standard is not one of strict liability for innocent or even negligent omissions or misstatements before the Patent Office. . . . [T]he misconduct must be accompanied by "some element of wrongfulness, willfulness, or bad faith."

*Id.* at 186. [Citations omitted.]

*See also Kearney & Trecker Corp. v. Cincinnati Milacron, Inc.,* 562 F.2d 365, 371 (6th Cir. 1977). "[M]ere technical fraud is not sufficient to deny enforceability, but . . '"scienter" or fraudulent intent . . . is an integral part of the defense of fraud.'" [Citations omitted.] *See generally,* I Kayton et al., Fraud in Patent Procurement, Genuine and Sham Charges, 43 *Geo.Wash.L.Rev.* 1 (1974).

 Conduct which constitutes fraudulent patent procurement may also violate section 2 of the Sherman Act, 15 U.S.C. § 2, when the other elements of a section 2 case are established. *Walker Process Equip., Inc. v. Food Mach. & Chem. Corp.,* 382 U.S. 172, 174, 86 S.Ct. 347, 15 L.Ed.2d 247 (1965). However, affirmative relief requires proof not only of the alleged fraud but of "the relevant market, the dominance of the patented device therein, and the injurious consequences [to the charging party] of the patent's enforcement." *Id.* at 178, 86 S.Ct. at 351.

> To establish monopolization or attempt to monopolize a part of trade or commerce under § 2 of the Sherman Act, it would then be necessary to appraise the exclusionary power of the illegal patent claim in terms of the relevant market for the product involved. Without a definition of that market there is no way to measure [the patentee's] ability to lessen or destroy competition. It may be that the device . . . does not comprise a rel-

evant market. There may be effective substitutes for the device which do not infringe the patent. This is a matter of proof, as is the amount of damages suffered . . . . .

*Id.* at 177–78, 86 S.Ct. at 350.

 Defendant made no effort to establish the relevant geographic or product markets or the effect on the market of the Reinke patent monopoly. On the contrary, the record suggests thriving competition in the center pivot irrigation system industry among a variety of manufacturers a number of whom employ undertruss pipe support structures. Therefore, even if defendant had successfully proved fraudulent patent procurement, its counterclaim based on section 2 of the Sherman Act must fail.

In addition, the defendant fell far short of establishing by clear, unequivocal and convincing evidence that Mr. Reinke wilfully or intentionally deceived the Patent Office, concealed his knowledge of the Raincat undertruss design or diverted the patent examiner's attention from pertinent prior art. Mr. Reinke testified that he disclosed to his attorneys and the Patent Office the prior art known to him which he in good faith considered relevant to his patent applications.

In his applications, Mr. Reinke cited, among other examples of prior art, the patent owned by Layne and Bowler which describes pipe with a truss support and which refers to the Maggert patent containing an undertruss design similar to the Raincat. As this information was before the Patent Office, the Court cannot conclude that the patent examiner would have denied Mr. Reinke's applications "but for" the alleged nondisclosures. *See Timely Prod. Corp. v. Arron,* 523 F.2d 288, 297–98 (2nd Cir. 1975).

*Patent Misuse, Restraint of Trade*

On August 17, 1968 and December 31, 1968, Reinke Manufacturing Company granted Gifford-Hill-Western, Inc. and Kenasco Corporation licenses to manufacture the Electrogator including its patentable features [Exhibits 14 and 115]. These

agreements contained territorial restrictions on the licensees' sale of products embodying Mr. Reinke's inventions. Defendant contends that such restrictions violated section 1 of the Sherman Act, 15 U.S.C. § 1, for which defendant seeks treble damages, and constitute patent misuse, rendering the Reinke patents unenforceable.

The doctrine of patent misuse provides a defense to charges of infringement by rendering unenforceable a patent which has been "misused," such as by conduct offensive to the antitrust laws. *Morton Salt Co. v. G. S. Suppiger Co.,* 314 U.S. 488, 492–93, 62 S.Ct. 402, 86 L.Ed. 363 (1942). However, as the 1968 agreements pre-date Mr. Reinke's ownership of the '826 and '953 patents, the doctrine would appear to be inapplicable. Moreover, if the unlawful practice has been abandoned and the consequences of the improper exploitation have been dissipated, the misuse is considered "purged," and the owner's right to enforce the patent revives. *Id.* at 493, 62 S.Ct. 402; *Kearney & Trecker Corp. v. Cincinnati Milacron, Inc., supra,* 562 F.2d at 371. Plaintiff asserts that the agreements are no longer in effect and that it discontinued use of such restrictions in 1971. [*See also* Filing # 34.]

Under section 4 of the Clayton Act, 15 U.S.C. § 15, only a "person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue" for treble damages. Defendant failed to present any evidence of actual impact or direct injury suffered as the result of plaintiff's 1968–1971 licensing practices. As the 1968 agreements were executed and terminated before the defendant entered the center pivot sprinkler market, the defendant lacks standing to maintain its antitrust counterclaim based on the territorial restrictions in such agreements.

*Obviousness*

Center pivot irrigation equipment is subject to a variety of loads and stresses, such as the weight of its own structure, natural forces such as wind, stresses arising from the dynamics of travel over rough terrain, uneven loads as water passes through the pipe. All such machines, therefore, must include features to maintain the pipe in alignment and avoid breakage or collapse of the pipe spans and drive units.

Mr. Reinke asserts [Filing # 53] that his truss structure prevents or withstands "wallowing" or "whipping"[7] under such stresses by the "manner in which the braces and pipe are arranged and interconnected with each other and the tying rods [which] produces an interaction which rigidifies the assembly." Defendant contends that even if the Reinke V-brace configuration withstands loads and stresses more effectively than truss structures previously used on pivot sprinklers, the Reinke trussed pipe represents an obvious extension of the prior art.

Under 35 U.S.C. § 103, an invention is not patentable if

the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains.

Obviousness is a question of law which must be determined in light of three factual considerations: the scope and content of the prior art, the differences between the prior art and the claims in issue, and the level of ordinary skill in the pertinent art. *Graham v. John Deere Co.,* 383 U.S. 1, 17, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966). Even if a device "works better" than previous analogous devices, "an improvement which is obvious to those skilled in the art is not entitled to protection." *Airlite Plastics Co. v. Plastilite Corp.,* 526 F.2d 1078, 1082 (8th Cir. 1975), *cert. denied,* 425 U.S. 938, 96 S.Ct. 1671, 48 L.Ed.2d 179 (1976).

---

7. Mr. Reinke defined "wallowing" as the "presence of unwanted flexing of the pipe between carriages in a serpentine fashion and generally in an up and down direction from its normal configuration" and "whipping" as "generally the same action, but in a sidewise direction." [Filing # 53.]

Moreover, these are combination patents. No individual elements of the Reinke truss was unknown to the structural arts. The question is whether known elements were combined in a new way to produce a new or unusual result.

Courts should scrutinize combination patent claims with a care proportioned to the difficulty and improbability of finding invention in an assembly of old elements. *Sakraida v. Ag Pro, Inc.,* 425 U.S. 273, 281, 96 S.Ct. 1532, 1537, 47 L.Ed.2d 784 (1976), *citing Great A. & P. Tea Co. v. Supermarket Equip. Corp.,* 340 U.S. 147, 152, 71 S.Ct. 127, 95 L.Ed. 162 (1950). A "combination which only unites old elements with no change in their respective functions" is not patentable even if "a more striking result" is achieved. *Id.* 425 U.S. at 282, 96 S.Ct. at 1537.

To sustain a combination patent it must be shown that there is invention in the combination and not merely an aggregation of known elements each performing its known function. The combination as a whole must exceed the sum of its parts; that is to say, there must be more than the total of the functions each element was known to be capable of performing. *Lage v. Caldwell Mfg. Co.,* 138 U.S.P.Q. 497, 501 (D.Neb.1963), *citing Great A. & P. Co. v. Supermarket Equip. Corp., supra.* The subject of a combination patent claim must produce a "new or different function . . . an effect greater than the sum of the several effects taken separately . . . [a] synergistic result." *Anderson's-Black Rock, Inc. v. Pavement Salvage Co., Inc.,* 396 U.S. 57, 60–61, 90 S.Ct. 305, 308, 24 L.Ed.2d 258 (1969).

The principal items of prior art relied on by the defendant are the "Raincat" system [Exhibits 144, 145, 148] manufactured by Melvin Brown [Mel Brown] for Layne & Bowler, the "modified Mel Brown" [Exhibits 146, 189], U.S. Patent No. 3,335,958 issued on August 15, 1967 to David A. Wallace [Exhibit 169 at 8, Figures 1, 7, specification at column 4], the Allwood Australian patent number 227737, accepted in the U.S. Patent Office on April 14, 1960 [Exhibit 169 at 57, Figures 1, 8, specification at 4], and a bridge truss illustrated in the Swiss Klasse patent number 201557 issued in October, 1937 and received in the U.S. Patent Office on April 18, 1939 [Exhibit 170 at 58, Figures 1, 2, 3, 4, 8]. (The text is untranslated.)

The Raincat, D. A. Wallace and Allwood patents illustrate undertruss support structures for irrigation pipe composed of pairs of single braces extending downward from the pipe in diverging relation, connected by a cross member. The bottom chord or tension members consist of chains, cables or tie rods. A side view reveals a single vertical brace. Faced from the front, the brace members form a triangular or A-frame shape. These are planar structures, triangulated in the vertical plane.

Mel Brown testified that the ten machines he built for Layne & Bowler in 1963 and 1964 were the first in this country to employ electric drive units and an undertruss pipe support assembly. The Raincat included sectional pipe joined by ball joints and therefore had "means articulately connecting the sections together to enable angulation of one section of the pipe in relation to another." [*See* Exhibit 1, claim 4.] The tie rods were secured to the pipe at the ends of ninety-foot spans initially by U-bolts. They therefore were "connected longitudinally of the apices of the braces along each side of the pipe with the ends thereof being connected to the pipe at the end of each section." [*See* Exhibit 1, claim 4.]

In the first two systems built for Layne & Bowler, Mel Brown encountered slippage problems which caused "racking" or unwanted twisting movement of the water pipe and tension members in opposite directions, working against each other. In order to stiffen the machine, he added V-shaped braces to the existing triangular brace assembly, creating an A-frame with V-braces. Mr. Brown testified that the V-braces then bore the forces introduced to the system and rendered the original vertical braces of the A-frame inoperative. The modified Mel Brown truss, like the later Reinke and "Kroy" models, was a spatial

system with added stability caused by triangles existing in several planes. The fact that Mr. Brown subsequently dispensed with the added V-braces when he turned to other means to cure the slippage problem does not remove the "modified Mel Brown" structure from the prior art for purposes of determining whether the Reinke V-brace device was obvious when invented.

Mr. Hossack identified "the level of ordinary skill in the pertinent art" at the time of the Reinke invention as that of a person who had been a farmer and who worked in the shop of a structural engineering concern or that of a student of structural engineering. In other words, the obviousness of the Reinke invention is to be judged from the point of view of a person in late 1967 with somewhat more than elementary skills in and knowledge of the structural engineering arts who was conversant with irrigation equipment. Such person would have been aware of basic principles of truss design.

Mr. Hossack and defendant's expert witness, Ivan R. Jensen, professor of civil engineering, explained principles of truss construction long known to the structural arts of bridge, roof and related designs. A truss is essentially a structure consisting of straight pieces joined to form a series of triangles in a single plane. Continuous triangles may also be built into more than one plane, in which case the truss will have stability in each plane in which triangular support is found.

"Shear" consists of forces acting along a planar surface. If the shear load is more than the material can stand, it will fracture along the plane where the shear load is too great. Under tension, molecules spread or expand. Under compression, they compress. In a truss, members of the triangle resist by tension the tendency of other members to compress, and vice versa.

In general, the truss is based upon the geometric principle that the shape of a triangle cannot be deformed without altering the length of its sides, i. e., the sides of a triangle cannot move with respect to each other. The web members of a truss, the diagonal and vertical elements, assuming adequate connection features, maintain stability between the horizontal upper and lower chords of the truss. Therefore, as the triangle is the most stable planar configuration, the more planes into which triangulation is introduced, the greater the stability of the structure.

The Reinke concept of dual triangular assemblies connected by a cross bar as web members of a truss in which the water pipe and tie rods form the upper and lower chords created greater stability over prior planar structures and permitted longer pipe spans and fewer drive units. However, the Court finds that Mr. Reinke used conventional engineering principles to improve existing undertruss support systems found in the prior art of pivot sprinkler equipment. Moreover, the Court finds that Mr. Reinke applied structural principles long used in truss construction in the related fields of bridge, roof and other truss designs. No synergistic, surprising or new result is achieved by the Reinke truss. Each element performs its usual function, and the combination performs in the manner expected with these components. The Court concludes that the Reinke truss reflected in each of the claims, while an improvement in irrigation pipe support, reflects a mechanical contribution which would have been obvious to a person with knowledge of the prior art in irrigation equipment and ordinary skill in the structural arts at the time of Mr. Reinke's invention. Thus his improvement, although useful and successful, is not patentable.

> [E]ven though the use of a new device greatly improves the field and provides great utility, and commercial success is enjoyed because of the long-felt need, these features cannot sustain patentability where involved is only an extended application of obvious attributes from the prior art.

*Nat. Connector Corp. v. Malco Mfg. Co.,* 392 F.2d 766, 771 (8th Cir. 1968), *cert. denied,* 393 U.S. 923, 89 S.Ct. 254, 21 L.Ed.2d 259 (1968).

Furthermore, the Court finds that the limitations of Claims 1, 3, 4 and 5 of the '953 patent concerning use of angular clips and abutting flange connections represent merely a selection among old and well known fastening devices and are not patentable features in themselves. Nor do they add invention to the combination as a whole.

The Court's conclusion concerning the obviousness of the Reinke truss structure in light of the prior art is supported by the testimony of Ivan Jensen, Mel Brown and James Hossack. Mr. Jensen stated that diagonals are conventional truss elements. In his opinion, the Reinke truss system functions in substantially the same way as the "modified Mel Brown" pipe support. Mel Brown testified that there is no perceivable functional difference between his machine as modified by the addition of angle braces and the Reinke truss design. When asked to compare the Reinke claims and the modified Mel Brown truss in terms of functional differences, Mr. Hossack pointed only to deficiencies arising from Mel Brown's use of clamps as connection features, the fastening of braces to the underside of the pipe instead of to the pipe sides, and the use of lightweight materials rendering his V-braces incapable of sustaining much compression. However, the subject of the Reinke claims is a geometrical concept. Mr. Hossack failed to identify any functional innovations which would distinguish the geometry of the Reinke structure from the modified Mel Brown truss configuration.

The Reinke patent claims in issue may be entitled to a presumption of validity under 35 U.S.C. § 282, despite Mr. Reinke's failure to cite pertinent prior art in the patent applications, if, as plaintiff asserts, such prior art was classified within the classes searched by the patent examiner. However, the defendant has sustained its burden of proving invalidity of each of the claims in issue for obviousness and has successfully rebutted the presumption of validity, if applicable. Accordingly, judgment will be entered in favor of the defendant on the plaintiff's complaint and in favor of the plaintiff on the defendant's counterclaim, in accordance with this Memorandum Opinion.

## APPENDIX

Fig. 14

As illustrated in FIG. 14, the truss assembly 96 includes a pair of downwardly converging braces 100 attached to the pipe sections 36 by fastening lugs 102 in longitudinally spaced relation on the pipe sections. In the event the flanged couplings is positioned adjacent the truss assembly, it is positioned centrally between the braces 100. A similar pair of braces 104 are attached to the opposite surface of the pipe section 36 and the pair of braces 100 diverge downwardly from the pair of braces 104 with the braces 100 and 104 having connector plates 106 and 108 respectively connected to the lower ends thereof thus forming a pair of V-shaped braces rigidly fixed to opposite sides of the pipe section 36 and downwardly diverging. The connector plates . . . are interconnected by a transversely extending brace member 110 which retains the lower ends of the pairs of braces 100 and 104 in rigid spaced relation. The tension rods 98 are also connected to the brackets 106 and 108 respectively and form the lower chord or tension chord of a truss with the pipe . . . forming the upper chord or compression chord thereof. [Exhibits 1, 2.]