KIRK OPTICAL LENS CO.,
INC., Plaintiff,

v.

DIMELP INDUSTRIES, INC., Defendant.

No. 79 Civ. 3167.

United States District Court,
E. D. New York.

Nov. 10, 1981.

Bauer & Amer, P. C., Mineola, N. Y., for plaintiff.

Sheldon Palmer and Peter L. Berger, New York City, for defendant.

## MEMORANDUM & ORDER

PLATT, District Judge.

This is a motion by plaintiff, Kirk Optical Lens Co., Inc. (Kirk), to punish defendant, Dimelp Industries, Inc. (Dimelp), for contempt for failure to obey a final judgment entered by this Court on May 16, 1980.

The final judgment entered with the consent of both parties admits the validity of United States Letters Patent No. 3,258,323 and admits Dimelp's infringement of that patent. It further enjoins Dimelp "from making, having made, using, selling or otherwise practicing the invention of said United States Letters Patent No. 3,258,323 or directly or indirectly infringing said patent by applying the claimed invention in and by said United States Letters Patent No. 3,258,323 to any article of manufacture for the purpose of sale, manufacture and/or use or in any way commercialized by way of advertising or offering for sale any article of manufacture to which such claimed invention has been applied, and from aiding or abetting or in any way contributing to the infringement of said patent."

### I

A brief history of the facts preceding the entry of the judgment is essential to understanding the nature of the issues presently before this Court. Stanley Kirk, president

of plaintiff company, is the inventor of a device which employs a heating and cooling process by which glass lenses are made impact resistant.[1] The lens which is to be treated is placed horizontally on a support and is inserted into a kiln through a constantly open passageway. The kiln is surrounded by insulation. The kiln and insulation are fully enclosed in a metal housing. Compressed air is pumped through pipes, or "fluid supply means" that run through the insulation. The fluid supply means are placed so as to pass along the top and underneath the bottom of the kiln. The fluid supply means extend out of the front of the housing. When the lens is drawn out of the kiln, the air which has run through the fluid supply means and thus has been heated and dried, is directed onto both the convex and concave sides of the lens.

In September 1979, Kirk came into possession of the Dimelp Model HT 3000 lens hardener (original HT 3000) which it claimed infringed its patent. Kirk and Dimelp engaged in an exchange of correspondence and negotiations regarding the alleged infringement.

Despite the fact that the original HT 3000 was identical to the Kirk patented model, in a letter dated October 29, 1979, Dimelp's attorney asserted to Kirk that the original HT 3000 was not an infringing device. That letter, which is material to the instant proceeding, reads in pertinent part:

> Regarding your inquiry as to how Dimelp's present construction structurally avoids infringement of your client's patent, please refer to lines 11–12 of claim 1 of the patent.
>
> " . . . said fluid supply means extending through said housing *and the insulation therein. . . .*"

The Dimelp HT 3000 as presently constructed does not include this structural limitation. The Dimelp fluid supply means extends through the housing, but not through the insulation.[2]

The parties eventually were able to negotiate a settlement and the above-mentioned judgment was entered. Dimelp subsequently discontinued the manufacture and sale of its infringing original HT 3000 lens hardener.

In November, 1980, Dimelp decided to market a new lens hardener. In March, 1981, it offered this new device for sale at a trade fair. It is this new model HT 3000 lens hardener (new HT 3000) which triggered Kirk's current motion for contempt. A hearing on the motion was held on September 15, 1981 at which the presidents of both plaintiff and defendant testified.[3]

1. Stanley Kirk obtained his patent in 1966. He assigned it to the plaintiff company.

2. Letter dated October 29, 1979 from Sheldon Palmer, Esq., to Jerome Bauer, Esq.

3. Gene Georgiadis, the president of defendant, Dimelp Industries, testified at the hearing that Dimelp has manufactured two model HT 3000 lens hardeners. The original model was the subject of the original judgment. The lens hardener which is the subject of this contempt motion also has been labeled by Dimelp as a model HT 3000.

Georgiadis also testified that he showed Stanley Kirk an Imperial lens hardener manufactured by a third party. He stated that the new HT 3000 offered for sale at the trade fair was modeled after the Imperial model and that Kirk had told him that the Imperial model did not infringe the patent. The new HT 3000 does not, however, conform to the allegedly non-infringing Imperial model. In the Imperial, the fluid supply means do not extend over the top and below the bottom of the kiln but rather, around the side of the kiln. It should be noted that the Imperial model is not at issue here and we are not called upon, nor have we considered whether Dimelp's production of a device conforming to the Imperial would be a contempt of the May 16 judgment.

Finally, Georgiadis also testified and offered into evidence a letter showing that Stanley Kirk's original objection to the new HT 3000 offered for sale at the trade fair was that Georgiadis was selling the device at a price less than $200 greater than Kirk's list price for its lens hardeners. This sale price violates an agreement entered into by the parties incident to the final judgment. Paragraph 5 of that agreement provides in pertinent part:

> . . . DIMELP agrees that for as long as DIMELP purchases Heat Lens Hardeners from KIRK at discount, it shall not manufacture, sell or offer for sale a Heat Lens Hardener at a price that is less than Two Hundred ($200.00) Dollars greater than KIRK's published list price of the Heat Lens Hardeners that DIMELP purchases from KIRK.

Dimelp's new HT 3000, the device in issue, is composed of a kiln which is surrounded by a metal casing.[4] The fluid supply means run across the top outer side and bottom outer side of this metal casing. The kiln in its casing and the fluid supply means are then fully enclosed in an outer metal housing. There is no solid insulation between the casing and the housing.[5]

Kirk first argues that Dimelp's admission of infringement in the prior judgment incorporated an admission that the construction set forth in the October 29 letter (October 29 construction) was also an infringement. Alternatively, Kirk claims that the new HT 3000 is merely a colorable modification of the infringing original HT 3000.

Dimelp denies that the construction set forth in its October 29 letter was admitted to be an infringing apparatus by virtue of the consent judgment.[6] In addition, Dimelp relies upon the assertions made in the October 29 letter—that a device in which the fluid supply means do not run through the insulation is not within the scope of the patent claims—in support of its defense that the new HT 3000 is non-infringing and thus without the scope of the judgment.

## II

■ Initially, we must determine whether the October 29 construction was included in the judgment entered by this Court. If it was, we must determine whether the new HT 3000, conforms to that construction and thus constitutes a contempt.

In making this determination we are not limited to an examination of the four corners of the judgment, but may construe it in light of the circumstances surrounding its formation, the technical meaning given to words by the parties, and other expressly incorporated documents. *United States v. ITT Continental Baking Co.*, 420 U.S. 223, 239, 95 S.Ct. 926, 935, 43 L.Ed.2d 148 (1975); *Artvale, Inc. v. Rugby Fabrics Corp.*, 303 F.2d 283, 284 (2d Cir. 1962).

The judgment itself makes no reference to the October 29 letter. The circumstances in which the letter was written do, however, shed some light on this question. The letter was written at the time when Kirk first alleged infringement of its patent. It was written on behalf of the alleged infringer who was attempting to negotiate his way out of a threatened infringement suit. It purports to describe the original HT 3000. The letter argued that Dimelp was not infringing the Kirk patent because the fluid supply means did not pass through the insulation. Nevertheless, regardless of Dimelp's protestations in that letter to the contrary, the original HT 3000 did in fact contain a fluid supply means that extended through the housing and through the insulation therein. Whatever may have been Dimelp's counsel's motivation in describing the October 29 construction and in misrepresenting that description as the original HT 3000, it is clear that he did not describe the device which Kirk charged to be and which ultimately was conceded to be infringing. Kirk had an infringing device in his possession and was fully aware of its

Even assuming that this was Kirk's only original objection to Dimelp's sale, this does not in itself stop Kirk from now claiming that the device is an infringement and violates the judgment.

4. As was described above, the Kirk device provides for one metal housing in which the entire unit is contained. The Dimelp construction has one metal housing in which the kiln is enclosed. A second metal housing encompasses the entire unit. For purposes of clarity in this opinion we have referred to the inner housing as the casing and the outer housing as the housing.

5. Throughout this opinion we use the words "solid insulation" to distinguish the insulation

materials used in the Kirk lens hardener and the original model HT 3000 manufactured by Dimelp from a layer of insulation composed of a liquid, air or other gas.

6. Dimelp does not argue the validity of the Kirk patent, nor does it deny that its original HT 3000 lens hardener constituted an infringement of the Kirk patent. Any such argument would nevertheless be futile since the consent judgment in which both validity and infringement were admitted is res judicata as to those issues. *See Siebring v. Hansen*, 346 F.2d 474 (8th Cir.), *cert. denied*, 382 U.S. 943, 86 S.Ct. 400, 15 L.Ed.2d 352 (1965).

actual construction. It was the existing original HT 3000 which was the subject of the first action, not any hypothetical constructs which may have been discussed while the parties negotiated. Thus we do not find the judgment, admitting Dimelp's construction to be infringing, to include the hypothetical construct which Dimelp's counsel argued all along to be non-infringing.[7]

### III

Dimelp's new HT 3000 may nevertheless constitute a contempt of the prior judgment if it is a "merely colorable" variation of the infringing model. *Interdynamics, Inc. v. Firma Wolf*, 653 F.2d 93 (3d Cir. 1981); *Siebring v. Hanson*, 346 F.2d 474 (8th Cir.), *cert. denied*, 382 U.S. 943, 86 S.Ct. 400, 15 L.Ed.2d 352 (1965); *Hopp Press, Inc. v. Joseph Freeman & Co.*, 323 F.2d 636 (2d Cir. 1963).

An examination of the Kirk and Dimelp devices shows that the only difference in their construction is that the Kirk patent model and the original HT 3000 contain solid insulation whereas the new HT 3000 is devoid of solid insulation and contains only air space. The operation of the devices is otherwise identical.

Our inquiry thus concerns the substitution of air space in the new HT 3000 for the solid insulation in the original HT 3000. If the new HT 3000 "performs substantially the same function in substantially the same way to obtain the same result [then it is] the same [as the original HT 3000] though different in form." *Graver Tank & Mfg. Co. v. Linde Products Co.*, 339 U.S. 605, 70 S.Ct. 854, 94 L.Ed. 1097 (1950); *Union Paper-Bag Machine Co. v. Murphy*, 97 U.S. 120, 24 L.Ed. 935 (1877). This doctrine of "equivalents" is designed to ensure that a "patent is construed broadly enough to cov-

er what [the patentee] disclosed and claimed when his language is reasonably read in the light of the prior art." *Kaumagraph Co. v. Superior Trade Mark Mfg. Co.*, 72 F.2d 417, 420 (2d Cir. 1934); *see Decca Ltd. v. United States*, 420 F.2d 1010 (Ct.Cl. 1970); *Royal Typewriter Co. v. Remington Rand*, 168 F.2d 691 (2d Cir. 1948).

■ Kirk's claim, which governs the scope of the patent, uses the word "insulation." United States Letters Patent No. 3,258,323 at col. 4, line 50. While the Kirk model makes use of a solid insulation, a solid insulation is not specified in the claim. Dimelp has merely removed the solid insulation and allowed air to fill space between the kiln and the housing.[8] Although this space is not airtight and thus concededly creates a poor layer of insulation, the air between the two metal layers (the casing and the housing) does in fact have an insulating effect. It is not essential in invoking the doctrine of equivalents that the substituted product be superior to the replaced product. *Reinke Manufacturing Co., Inc. v. Sidney Manufacturing Corp.*, 199 U.S.P.Q. 401, 407 (D.Neb.1978). The fluid supply means in the new HT 3000 pass through the air space between the casing and the housing. The air space does provide a layer of insulation between the kiln and the outer housing. The air within the fluid supply means is heated and dried before it is sprayed onto the lens being treated.

The new HT 3000 thus performs the same function as the original HT 3000 and the Kirk model. It does so in substantially the same way and achieves substantially the same result.

### IV

■ Dimelp argues that Kirk is barred from asserting that air is an equivalent

---

7. Nor do we intimate any opinion as to whether or not a construction such as that described in the October 29 letter in which the fluid supply means do not pass through insulation would be an infringing device. Of course, having determined that the October 29 construction was not admitted to be an infringement in the May 29 judgment, we need not go on to address the question of whether the new HT 3000 conforms to that construction.

8. The layer of solid insulation in the Kirk model serves the additional purpose of holding together the fire brick material out of which the kiln is constructed. By removing the solid material insulation, Dimelp was required to substitute another means for holding the kiln together. This was accomplished by surrounding the kiln with the metal casing.

form of insulation by virtue of the file wrapper estoppel doctrine. That doctrine operates to limit the range of equivalents which are covered by a patent. It prevents a patentee who narrowed the scope of his claims in order to distinguish them from prior art and obtain a patent, from later arguing a broad application of his claims against alleged infringers. *Exhibit Supply Co. v. Ace Patents Corp.*, 315 U.S. 126, 62 S.Ct. 513, 86 L.Ed. 736, reh. den. 315 U.S. 828, 62 S.Ct. 792, 86 L.Ed. 1223 (1942); *Cohn v. Coleco Indus. Inc.*, 194 U.S.P.Q. 241 (2d Cir. 1977); *Rosen v. Kahlenberg*, 474 F.2d 858 (5th Cir. 1973).

An examination of the Kirk patent file wrapper shows that Stanley Kirk originally submitted five claims. The first claim, which is relevant here, provided:

1. An ophthalmic lens hardening apparatus. comprising a housing, an electric kiln in said housing, a constantly open passageway defined in said housing and leading to said kiln, a lens conveyor having horizontally disposed lens support means on which a rim edge of an ophthalmic lens may rest, means on said conveyor to move said lens support means into and out of said kiln through said constantly open passageway, and fluid means directed at the upper and lower sides of the ophthalmic lens resting on said lens support means when the same is out of said kiln, said fluid supply means extending through said housing and the fluid therein being preheated and dried by the heat in said housing whereby fluid supplied by said fluid supply means to the ophthalmic lens is preheated and dried.

The claims examiner rejected all five claims as "unpatentable over [the prior art]." [9] Specifically in regards to the fluid supply means, the examiner stated that the prior art

show[s] the fluid supply means for the spray means mounted within the kilm [sic] housing. Obviously the spraying fluid would be heated by said kilm [sic] because of the environment. No patentable weight can be given to the functional statement that the fluid or air contacting the lens blank is preheated and dried, for this limitation is directed to use or function of the apparatus. No structure is recited· to condition the spraying fluid in any particular manner, different from that shown by the references.

Subsequently Stanley Kirk amended the claims and resubmitted them. There were further face to face discussions with the claims examiner on January 18, 1966. As a result of these, further amendments were made and claim 1 was finally submitted and approved with the following amendments as indicated below by the underlined words:

1. An ophthalmic lens hardening apparatus comprising a housing, an insulated electric kiln fully enclosed in said housing, a constantly open passageway defined in said housing and leading to said kiln, a lens conveyor having horizontally disposed lens support means on which a rim edge of an ophthalmic lens may rest, means on said conveyor to move said lens support means in and out of said kiln through said constantly open passageway, and fluid supply means directed at the upper and lower sides of the ophthalmic lens resting on said lens support means when the same is out of said kiln, said fluid supply means extending through said housing and the insulation therein and positioned with respect to said kiln so that the fluid therein is preheated and dried by the heat said kiln in said housing whereby fluid supplied by said fluid supply means to the ophthalmic lens is preheated and dried.

---

**9.** The claims examiner referred to the following claims for lens hardening devices as prior art:

Eves, United States Letters of Patent No. 2,577,611

Jackson, United States Letters of Patent No. 2,409,284

Oughter, et al., United States Letters of Patent No. 2,455,085

Vent, United States Letters of Patent No. 2,762,166

None of these patents call for a fluid supply means to extend fully through a housing and the insulation within the housing.

While it is undoubtedly true that the amendments were made to distinguish the Kirk apparatus from prior art, an examination of the prior art and the Kirk file wrapper reveal that the word "insulation" cannot be narrowly construed to mean only solid insulating materials as Dimelp suggests.

Indeed the claims examiner noted that in the prior art, the fluid supply means were "mounted within the kiln housing." The examiner's objection to the Kirk claim was not related to the fact that the fluid supply means extended through any particular medium or material. Neither his objections nor an examination of the prior art reveal any earlier device in which the fluid supply means extend through the housing and any type of insulation including air space. Kirk's addition of the word "insulation" was not required in order to distinguish the solid insulation he proposed to use from any other type of insulation. Rather, it was added to more fully explain *the location and placement* of the fluid supply means in the Kirk device. It was this distinction, the placement of the fluid supply means through the insulation, and not the mere use of insulation,[10] that along with the other amendments rendered the Kirk device patentable over the prior art.

Neither the prior art nor the rejection by the claims examiner warrants the conclusion that passage of the fluid supply means through *solid* insulation was required in order to distinguish Stanley Kirk's claim. Thus we find Kirk is not barred from claiming that a layer of air between the kiln and housing is an equivalent for the solid insulation used in its lens hardener. In short and in the last analysis, the new Dimelp HT 3000 is merely a colorable variation of the original HT 3000 and within the scope of the Kirk claim.

In view of the foregoing, we find that Dimelp Industries, Inc. is in contempt of the final judgment entered on May 16, 1980.

The attorneys are directed to contact the Deputy Courtroom Clerk, Mr. Bruce Nims, to arrange for a hearing on the issue of damages.

SO ORDERED.

---

**10.** This is not to say that the use of insulation is unimportant but rather that it is the passage of the fluid supply means through an insulator that is significant.