REINKE MANUFACTURING COMPANY, INC., Appellant-Cross-Appellee,

v.

SIDNEY MANUFACTURING CORPORATION,
Appellee-Cross-Appellant.

Nos. 78–1341, 78–1301.

United States Court of Appeals,
Eighth Circuit.

Submitted Nov. 15, 1978.

Decided Feb. 26, 1979.

**645**

ration, the alleged infringer of the patents, primarily cross-appeals from the trial court's determination that, if the patents are valid, Sidney infringed the claims of the patents in question.[2]

■ Because we affirm the district court's finding that the patents are invalid for reasons of obviousness under 35 U.S.C. § 103,[3] it is not necessary to consider the issue of infringement. There can be no infringement of an invalid patent. *Greening Nursery Co. v. J & R Tool & Mfg. Co.,* 376 F.2d 738, 742 (8th Cir. 1967).

■ The Supreme Court set out the section 103 standard in *Graham v. John Deere Co.,* 383 U.S. 1, 17–18, 86 S.Ct. 684, 694, 15 L.Ed.2d 545 (1966):

While the ultimate question of patent validity is one of law * * * the § 103 condition, which is but one of three conditions, each of which must be satisfied,[4] lends itself to several basic factual inquiries. Under § 103, the scope and content of the prior art are to be determined; differences between the prior art and the claims at issue are to be ascertained; and the level of ordinary skill in the pertinent art resolved. Against this background, the obviousness or nonobviousness of the subject matter is determined. Such secondary considerations as commercial success, long felt but unsolved needs, failure of others, etc., might be utilized to give light to the circumstances surrounding the origin of the subject matter sought to be patented. As indicia of obviousness or nonobviousness, these inquiries may have relevancy. * * *

Carter H. Kokjer (argued), of Lowe, Kokjer, Kircher, Wharton & Bosman, Kansas City, Mo., and William P. Mueller, of McGinley, Lane, Mueller, Shanahan, McQuillan & Gale, Ogallala, Neb., on brief, for Reinke Mfg. Co., Inc.

Dennis L. Thomte, of Zarley, McKee, Thomte, Voorhees & Sease, Omaha, Neb., argued and on brief, for Sidney Mfg. Co.

Before STEPHENSON, HENLEY and McMILLIAN, Circuit Judges.

STEPHENSON, Circuit Judge.

This case involves two patents, No. 3608826 ('826) and No. 3750953 ('953), on a circular irrigation system known as the Electrogator. Plaintiff-appellant Reinke Manufacturing Company, the assignee of the patents, primarily appeals from the trial court's [1] determination that the patents are invalid for reasons of obviousness. Defendant-appellee Sidney Manufacturing Corpo-

1. The Honorable Robert F. Denney, United States District Judge for the District of Nebraska.

2. Sidney also raises several other issues, but in light of our holding, a discussion of those is not necessary.

3. 35 U.S.C. § 103 provides:
A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole

would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. Patentability shall not be negatived by the manner in which the invention was made.

4. In addition to being nonobvious, an invention must also be useful and novel in order to be patentable. 35 U.S.C. §§ 102, 103; *Clark Equip. Co. v. Keller,* 570 F.2d 778, 785 (8th Cir. 1978), *cert. denied,* —— U.S. ——, 99 S.Ct. 96, 58 L.Ed.2d 118 (1978).

This is not to say, however, that there will not be difficulties in applying the nonobviousness test. What is obvious is not a question upon which there is likely to be uniformity of thought in every given factual context. The difficulties, however, are comparable to those encountered daily by the courts in such frames of reference as negligence and scienter, and should be amenable to a case-by-case development. We believe that strict observance of the requirements laid down here will result in that uniformity and definiteness which Congress called for in the 1952 Act.

While a presumption of validity is accorded to patents that have "survived the scrutiny of the Patent Office," *Woodstream Corp. v. Herter's, Inc.*, 446 F.2d 1143, 1149 (8th Cir. 1971), and while the primary responsibility for initially making determinations inherent in approving patents lies with the Patent Office, the reviewing court has the responsibility of applying the strict and invariable standard of section 103 as mandated by the Supreme Court in *Graham v. John Deere Co.*, *supra*, 383 U.S. at 17–19, 86 S.Ct. 684.

■ In applying section 103, it is important to keep in mind that the test is not whether the object is an improvement in the art; it is not whether the object works better; "an improvement which is obvious to those skilled in the art is not entitled to protection." *Airlite Plastics Co. v. Plastilite Corp.*, 526 F.2d 1078, 1082 (8th Cir. 1975), *cert. denied*, 425 U.S. 938, 96 S.Ct. 1671, 48 L.Ed.2d 179 (1976).

The district court's factual discussion of the Reinke patents provides an excellent understanding of the subject matter:

The subject of the Reinke patents is an electrically driven circular irrigation system in which the water pipe carrying sprinkler heads serves as part of a traveling sectional boom. One end of the boom is connected to a stand assembly positioned in the center of a square area to be irrigated. The boom moves in a circular path around the stand assembly. Such machines are generally known as center pivot irrigation systems, because the boom carrying the sprinkler heads travels around the central stand or pivot location containing the water supply pipe.

In the Reinke patents, the boom is propelled in a circular path by electrically driven wheeled towers, i. e., "drive units," spaced at intervals. The wheel assemblies also provide support so that the boom is maintained in a straight line as it rotates. The boom itself consists of the water pipe and a supporting truss assembly underneath and interconnected with the water pipe.

Generally, the truss is constructed as follows[:] * * * The water pipe forms the top chord of the truss, and the bottom or tension chord is formed by cables or tie rods. On either side of the water pipe, brace chords in the shape of a "V," attached to the pipe at the upper ends of the V, extend downward with the apex of each V connected to a bottom or tension chord. The V braces form the web members of the truss. A transversely extending brace, or connector bar, is attached to the apices of the V's at the points where the apices are fixed to the bottom or tension chords.

*Reinke Mfg. Co. v. Sidney Mfg. Corp.*, 446 F.Supp. 1056, 1060 (D.Neb.1978).

Fig. 2a of Patent '826

Side Sketch of Electrogator

Fig. 14 of Patent '826

Close-up Sketch of Truss Section of Electrogator

The dispute in this case centers around claims 4 and 11 of the '826 patent, and claims 1, 3, 4 and 5 of the '953 patent,[5] which primarily describe the truss which

5. The claims provide in pertinent part:

The '826 patent:

4. An irrigation apparatus comprising an elongated pipe[,] * * * said elongated pipe including a truss structure disposed along the undersurface thereof between the wheeled means, said structure including a plurality of pairs of V-shaped braces having the upper ends connected to the pipe in longitudinally spaced relation with the braces in each pair depending downwardly in converging relation to each other and in diverging relation to the braces in an opposed pair, means interconnecting the apices of the pairs of braces to retain them rigidly in spaced-apart relation, and tension rods connected longitudinally of the apices of the braces along each side of the pipe with the ends thereof being connected to the pipe at the end of each section thereof thereby rigidifying and supporting the pipe.

11. * * * that improvement comprising a supporting truss structure for the pipe including a plurality of longitudinally spaced brace assemblies fixed to said pipe and depending therefrom, each brace assembly including a pair of opposed brace members of V-shaped configuration having the upper ends thereof attached to the pipe and depending in diverging relation, means retaining the lower apices of opposed pairs of brace members in spaced relation, and tension members connected to the apices of said brace members and extending and attached to the pipe at remote points for rigidifying the pipe and forming a truss support therefor.

The '953 patent:

1. * * * that improvement comprising a supporting truss structure for the pipe including a plurality of longitudinally spaced brace assemblies fixed to said pipe and depending therefrom, each brace assembly including a pair of opposed brace members of V-shaped configuration having the upper ends thereof attached to the pipe and depending in diverging relation, means retaining the lower apices of opposed pairs of brace members in spaced relation, and tension members connected to the apices of the brace members and extending and attached to the pipe at remote points for rigidifying the pipe and forming a truss support therefor, said pipe being sectional with the sections being joined by abutting end flanges, said tension members being attached to the pipe by extending through and being secured to a pair of abutting flanges.

3. * * * that improvement comprising a supporting truss structure for the pipe including a plurality of longitudinally spaced brace assemblies fixed to said pipe and depending therefrom, each brace assembly including a pair of opposed brace members of V shaped configuration having the upper ends thereof attached to the pipe and depending in diverging relation, means retaining the lower apices of opposed pairs of brace members in spaced relation, and tension members connected to the apices of the brace members and extending and attached to the pipe at remote points for rigidifying the pipe and forming a truss support therefor, the upper ends of the brace members being secured to angular clips rigidly affixed to the exterior surface of the pipe.

4. * * * a supporting truss structure for the pipe including a plurality of longitudinally spaced brace assemblies fixed to said pipe and depending therefrom, each brace assembly including a pair of opposed brace members having the upper ends thereof attached to the pipe and depending in diverging relation, means retaining the lower ends of opposed pairs of brace members in spaced relation, and tension members connected to the lower ends of the brace members and extending and attached to the pipe at remote points for rigidifying the pipe and forming a truss support therefor, the upper ends of the brace members being secured to clips rigidly affixed to the exterior surface of the pipe,

supports the water pipe and the attaching devices used in conjunction with the truss.

The district court stated the issue as follows:

Center pivot irrigation equipment is subject to a variety of loads and stresses, such as the weight of its own structure, natural forces such as wind, stresses arising from the dynamics of travel over rough terrain, uneven loads as water passes through the pipe. All such machines, therefore, must include features to maintain the pipe in alignment and avoid breakage or collapse of the pipe spans and drive units.

Mr. Reinke asserts * * * that his truss structure prevents or withstands "wallowing" or "whipping" under such stresses by the "manner in which the braces and pipe are arranged and interconnected with each other and the tying rods [which] produces an interaction which rigidifies the assembly." Defendant contends that even if the Reinke V-brace configuration withstands loads and stresses more effectively than truss structures previously used on pivot sprinklers, the Reinke trussed pipe represents an obvious extension of the prior art.

*Reinke Mfg. Co. v. Sidney Mfg. Corp., supra,* 446 F.Supp. at 1068 (footnote omitted).

■■■ As the district court noted, the patents in question are combination patents and " '[c]ourts should scrutinize combination patent claims with a care proportioned to the difficulty and improbability of finding invention in an assembly of old elements. . . . A patent for a combination which only unites old elements with no change in their respective functions . . . obviously withdraws what already is known into the field of its monopoly and diminishes the resources available to skillful men . . .' " *Sakraida v. Ag Pro, Inc.,* 425 U.S. 273, 281, 96 S.Ct. 1532, 1537, 47 L.Ed.2d 784 (1976),

*quoting from Great A. & P. Tea Co. v. Supermarket Equip. Corp.,* 340 U.S. 147, 152–53, 71 S.Ct. 127, 95 L.Ed. 162 (1950). Thus, if the claims cover a structure that combines old and well known elements, one of the factors this court must look for in determining whether the patents meet section 103 requirements is synergism: that which results "in an effect greater than the sum of the several effects taken separately." *Anderson's-Black Rock, Inc. v. Pavement Salvage Co.,* 396 U.S. 57, 61, 90 S.Ct. 305, 308, 24 L.Ed.2d 258 (1969).

In our examination we will not only consider whether it was *obvious* that by putting together the various elements used the result would be the effect achieved in the Electrogator; we will also consider whether the effect is a new effect, or simply each of the items performing its expected function.

As directed by *Graham,* we shall examine the prior art, the differences between the prior art and the claims in issue, and the level of ordinary skill in the art.

A. *Prior Art*

Initially we note that principles of truss design are long known to the structural arts of bridge, roof and related designs. A truss is essentially a structure consisting of straight pieces joined to form a series of triangles in a single plane. Continuous triangles may also be built into more than one plane, in which case the truss will have stability in each plane in which triangular support is found.

'Shear' consists of forces acting along a planar surface. If the shear load is more than the material can stand, it will fracture along the plane where the shear load is too great. Under tension, molecules spread or expand. Under compression, they compress. In a truss, members of the triangle resist by tension the tendency of other members to compress, and vice versa.

said tension members being attached to the pipe by being secured to flanges on the pipe.
5. The structure as defined in claim 4 wherein said pipe is sectional with the sections being joined by abutting end flanges, said tension members extending through and being secured to a pair of abutting end flang-es, each of said opposed brace members including two depending members defining a substantially V-shaped configuration having their lower end portions connected with each other and the tension members being connected with the lower end portions of the brace members.

In general, the truss is based upon the geometric principle that the shape of a triangle cannot be deformed without altering the length of its sides, i. e., the sides of a triangle cannot move with respect to each other. The web members of a truss, the diagonal and vertical elements, assuming adequate connection features, maintain stability between the horizontal upper and lower chords of the truss. Therefore, as the triangle is the most stable planar configuration, the more planes into which triangulation is introduced, the greater the stability of the structure.[6]

*Reinke Mfg. Co. v. Sidney Mfg. Corp., supra,* 446 F.Supp. at 1070. Further, the connecting device is described by the claims in dispute, i. e:, the angle clips connecting the V-braces to the waterpipe and the method of connecting the ends of the tie rods,[7] are not new connecting devices or methods; all were known as part of the art prior to construction of the Electrogator.

Sidney relies upon (1) the "Raincat" system; (2) the "Modified Mel Brown" system; (3) the Wallace U.S. Patent No. 3,335,958; (4) the Allwood Australian Patent No. 227737; and (5) the illustrations in the Swiss Klasse Patent No. 201557 as evidence of prior art pertaining to the mechanical function of the irrigation system.

The Raincat is a pivot irrigation system with the waterpipe supported underneath by a simple truss design of triangular braces in vertical planes transverse to the pipe. The lower corners of the braces are connected by longitudinal tie members extending between the corners and up to the pipe. There is a 90-foot span between the drive units.

Example of
. triangular braces

6. There was sufficient evidence to support the conclusion that "trusses" are obvious. There was testimony from two expert witnesses concerning principles of truss construction and there was evidence of the use of truss structures in other similar irrigation systems and in bridge construction.

7. This consisted of extending the ends of the tie rods through holes in the pipe coupling flanges at the end of the boom section.

Fig. 5 of
Patent '953

Although the Raincat was built somewhat differently over a period of years, there was testimony that indicated that the arms of the triangles in the truss system were either attached to the waterpipe with clamps that were fastened around the machine or fastened to the flange that hooked together the pipe spans. In subsequent machines, the arms of the braces were welded to lugs.

At the beginning of production of the Raincats, the tie rods were fastened to the pipe with U-bolts.

The Modified Mel Brown—in essence, a modified Raincat—came about as a result of experimentation with the Raincat. Because the U-bolts connecting the tie rods slipped on the original design, the arm of the machine would go into an S-curve and consequently bend the waterpipe.

The first step toward correcting this problem was to put a V-brace at the center triangular brace, in order to keep the waterpipe and the tension rods from going in different directions (causing the S-curve).

Example of V-braces
added to triangular braces

The V-brace, depending upon the movement of the pipe and tension rods, will go into either tension or compression.

■ Later still, the V-braces were eliminated when the U-bolts were changed; the tension rods were instead welded together at a common point onto the pipe, solving the S-curve problem in a different manner.[8]

The Wallace U.S. Patent No. 3335958 and the Allwood Australian Patent No. 227737 are irrigation systems similar to the Raincat and the Electrogator. The Swiss Patent No. 201557 discloses the truss structure of what was referred to in testimony as a bridge. It was admitted as evidence by the district court but limited to the illustrations; the text is not translated into English.

Thus the scope and content of the prior art as shown at trial is, at its most refined

point, generally included in the Raincat and Modified Mel Brown systems.

### B. The Differences Between the Prior Art and the Claims in Issue

Reinke's primary argument is that none of the prior art discloses an arrangement in which the pipe between each pair of drive units is rigidified laterally, vertically, and torsionally by joining it with a plurality of assemblies of opposed braces of V-shape so arranged from one another and interconnected by the tie rods as in the Electrogator.

It is true that the Allwood, Raincat and Modified Mel Brown units all have vertical supports—the Electrogator does not. However, the Modified Mel Brown, in addition to the vertical supports, also has V-shaped braces similar to those on the Electrogator.

See picture in text, p. 5, Figure 14, # 102 for an example of the angle clip.

8. One of Reinke's contentions on appeal is that the evidence was insufficient to establish the Modified Mel Brown as prior art. We hold the evidence was sufficient; Mel Brown testified that he had built at least two of the modified structures and that they were shipped out to be used by customers. There was corroborating evidence of a drawing reflecting the modified

design, which was initialed by Mel Brown and dated March 26, 1963. The Reinke Patents are dated 1971 and 1973. Although Brown did admit that the structure as built was somewhat different than the drawing, the differences were minor. The primary modification, the added V-brace, was reflected in the drawing and Brown testified that the change was made to the two structures on which he worked.

In addition, truss design in general makes use of triangular braces in different planes in order to provide the support strength for which trusses are used.

Reinke still contends that the effect of its invention was to achieve a self-propelled irrigation system with a span between drive units in excess of 90 feet (120 feet) with the same attributes of strength, alignment and economy as the previously marketed irrigation systems with only 90-foot spans between drive units. Reinke partially attributes this to the connecting devices used in the Electrogator. The connecting devices for the truss support and the tie rods were different[9] in the Electrogator from prior art insofar as irrigation systems are concerned. Because Reinke alleges that the combined effect of all of the elements was new—new in that it created an effect heretofore undiscovered which enabled the span distance between drive units to be increased to 120 feet—Reinke contends that this complies with the concept of synergism.

We do not agree that this is synergism. When the resulting new combination produces a totally new functional aspect, to deny patentability in every case would be to sanction the use of "hindsight" in light of the claimed patent. However, at the same time, to deny patentability where the combination of elements is an obvious step, where no inherent difficulties or deterrents are involved in making the step, where the new combination results in a natural phenomenon, even though all of the advantages were not foreseen,

should not bring into play the introspective condemnation of using "hindsight." The test of obviousness, again, must turn upon a case by case analysis. *National Connector Corp. v. Malco Mfg. Co.,* 392 F.2d 766, 771 (8th Cir.), *cert. denied,* 393 U.S. 923, 89 S.Ct. 254, 21 L.Ed.2d 259 (1968).

Thus, the difference here, even when considered most favorably to Reinke, must be confined to the fact that Reinke used a better and different truss design than had been used before in irrigation systems; Reinke used better and different connecting devices than had been used before in irrigation systems; and Reinke achieved a longer span between drive units—without compromising other qualities—than had been achieved before in irrigation systems.

C. *Level of Ordinary Skill in the Art*

Testimony at the trial indicated that a person of ordinary skill in the structural arts in 1967 would have been a person "with somewhat more than elementary skills in and knowledge of the structural engineering arts who was conversant with irrigation equipment. Such person would have been aware of basic principles of truss design." *Reinke Mfg. Co. v. Sidney Mfg. Corp., supra,* 446 F.Supp. at 1070.

The question that must be resolved is whether this hypothetical person of ordinary skill in the art could have created the Electrogator with the differences as noted in Part B, *supra.* If such an ordinary person could have achieved the advancements discussed, the Electrogator is not a patentable invention as anticipated by section 103.

9. We note that Mr. Reinke did not attribute a great deal of importance to this at trial:

Q. [Mr. Thomte] I believe, Mr. Reinke, that you testified that the location of the openings in the flanges for the tie rods, were, I think in using your words, located at a very critical or strategic place. Would you elaborate on that, please?

A. [Mr. Reinke] They are located in the flange about one-third from the bottom because that is the most economical way to do it that I know of and as another pipe is attached to it, which there always is in this system, you have two flanges to go through, and that makes the cheapest, the most economical, the strongest way to attach the end tie rod.

Q. Could the tie rod be attached at the upper portion of the flange or at the bottom of the flange?

A. It could be.

Q. It wouldn't matter really where you attach it?

A. It would matter; it would make a difference, but not a significant difference.

Q. No significant difference where it is attached?

A. Well, I wouldn't make it that broad.

Q. I think that is just what you said, Mr. Reinke, that there wouldn't be any significant difference?

A. What I am saying is that it is located at the most ideal location, one third up.

■ As we stated in *University of Ill. Foundation v. Winegard Co.*, 402 F.2d 125, 127 (8th Cir. 1968), *cert. denied*, 394 U.S. 917, 89 S.Ct. 1191, 22 L.Ed.2d 452 (1969), *quoting Atlantic Works v. Brady*, 107 U.S. 192, 199–200, 2 S.Ct. 225, 27 L.Ed. 438 (1882):

"The process of development in manufactures creates a constant demand for new appliances, which the skill of ordinary head-workmen and engineers is generally adequate to devise, and which, indeed, are the natural and proper outgrowth of such development. Each step forward prepares the way for the next, and each is usually taken by spontaneous trials and attempts in a hundred different places. To grant to a single party a monopoly of every slight advance made, except where the exercise of invention, somewhat above ordinary mechanical or engineering skill, is distinctly shown, is unjust in principle and injurious in its consequences".[10]

As we stated before, the truss design in the Electrogator appears to be a *better* truss design than the Modified Mel Brown; the angle clip appears to be a *better* connecting device; and the attachment of the tension rods to the pipe in the Electrogator design appears to be a *better* way of connecting them. Because of these improvements, the span between the Electrogator drive units can be greater while still maintaining all other desirable features. Yet, the improvements and the results achieved by those improvements are no more than those which a "hypothetical person skilled in the art, who has thought about the subject matter of the patent invention in the light of that art" could have accomplished. *Flower City Architectural Metals v. Alpana Aluminum Prod., Inc.*, 454 F.2d 98, 108 (8th Cir. 1972).[11]

There is substantial evidence to support the trial court's finding that the '826 and '953 patent claims in issue are invalid for reasons of obviousness. It is therefore unnecessary to reach the issue of infringement. We affirm.

---

10. For example, as the Supreme Court stated in *Busell Trimmer Co. v. Stevens*, 137 U.S. 423, 11 S.Ct. 150, 34 L.Ed. 719 (1890):

The most that can be said of [the patent before us] is that it shows * * * great industry in acquiring a thorough knowledge of what others had done in the attempt to trim shoe soles in a rapid and improved mode, by the various devices perfected by patents for that purpose, good judgment in selecting and combining the best of them, with no little mechanical skill in their application; but it presents no discoverable trace of the exercise of original thought.

*Busell Trimmer Co. v. Stevens, supra*, 137 U.S. at 435, 11 S.Ct. at 154, *quoted in University of Ill. Foundation v. Winegard Co.*, 402 F.2d 125, 127 n.4 (8th Cir. 1968), *cert. denied*, 394 U.S. 917, 89 S.Ct. 1191, 22 L.Ed.2d 452 (1969).

11. Reinke argues that the testimony of the fabrication manager for Layne & Bowler (manufacturer of the Raincat), Mr. Walker, is in direct conflict with the trial court's finding of obviousness. Walker's testimony indicated that Layne & Bowler experimented with various truss designs in order to achieve a 120-foot span while still keeping other desirable features. Under the mandate of *Graham*, this "failure of others" is certainly a factor which may be considered as indicia of obviousness, *Graham v. John Deere Co., supra*, 383 U.S. at 17–18, 86 S.Ct. 684. "But where, as here, the facts establish convincingly that the invention was obvious against the background of the relevant prior art, [this] cannot be controlling." *Cummins Engine Co. v. General Motors Corp.*, 299 F.Supp. 59, 89 (D.Md.1969), *aff'd*, 424 F.2d 1368 (4th Cir. 1970), *quoted in Hadfield v. Ryan Equip. Co.*, 456 F.2d 1218, 1221 (8th Cir. 1972).