MEDTRONIC, INC., and Med-Rel,
Inc., Plaintiffs,

v.

CARDIAC PACEMAKERS,
INC., Defendant.

No. Civ. 3–80–617.

United States District Court,
D. Minnesota,
Third Division.

Jan. 19, 1983.

John D. Gould and Douglas A. Strawbridge, Minneapolis, Minn., for plaintiffs.

Orrin M. Haugen, Minneapolis, Minn., and Timothy J. Malloy, Chicago, Ill., for defendant.

DEVITT, Senior District Judge.

In this bench tried patents infringement suit between Minnesota corporations, each of which is engaged in the manufacture and sale of electromedical devices, plaintiffs Medtronic, Inc., and Med-Rel, Inc., claim that defendant Cardiac Pacemakers, Inc., has infringed three of their patents involving circuitry in implantable heart pacers and seek injunctive relief and damages. Defendant denies infringement and claims the patents are invalid for lack of novelty and for obviousness under 35 U.S.C. §§ 102, 103.

The patents in suit, labeled by the parties as "Greatbatch," "Wingrove" and "Walms-

ley," after the inventors, are more specifically identified as follows:

| Named Inventor | U.S. Patent No. | Claims Involved | Date Filed | Date Issued | Title |
|---|---|---|---|---|---|
| Wilson Greatbatch | 3,391,697 | 1, 8, 10, 11, 12 | 9/20/65 | 7/9/68 | Runaway Inhibited Pacemaker |
| Robert C. Wingrove | 3,833,005 | 1, 4, 5, 7, 8, 9, 10, 23 | 7/26/71 | 9/3/74 | Compared Count Digitally Controlled Pacemaker |
| Frank R. Walmsley | 3,901,247 | 13 | 1/13/72 | 8/26/75 | End of Life Increased Pulse Width and Rate Change Apparatus |

Jurisdiction lies under 28 U.S.C. § 1338(a). The case was tried to the court over a seven day period beginning on September 7, 1982. Twelve witnesses were heard, including the three named inventors and expert witnesses for both parties. Arguments have been heard and briefs lodged.

We deal here with small battery powered electronic pulse generators used to artificially stimulate damaged or diseased hearts. It is plaintiffs' position that defendant's pacemakers infringe upon the three patents now owned by plaintiffs. Plaintiffs claim that defendant's Microlith-P pacer, and others like it, embody a rate-limiting circuit equivalent to Greatbatch, a digitally controlled, remotely programmable circuit equivalent to Wingrove, and a battery voltage sensing circuit equivalent to Walmsley. As stated, defendant denies infringement and asserts that the three patents are invalid either for lack of novelty or for obviousness. Because of our disposition of the validity issue, we do not reach the question of infringement.

## I

■ We are governed by pertinent legal standards. Each of the patents in suit is presumed to be valid. 35 U.S.C. § 282; *Woodstream Corp. v. Herters, Inc.,* 446 F.2d 1143, 1149 (8th Cir.1971). A party challenging a patent can rebut this presumption by presenting "substantial" evidence of invalidity. 35 U.S.C. § 282; *Clark Equipment Co. v. Keller,* 570 F.2d 778, 795 (8th Cir.), *cert. denied,* 439 U.S. 825, 99 S.Ct. 96, 58 L.Ed.2d 118 (1978). Particularly strong rebuttal evidence is proof of pertinent prior nonconsidered art. *Ralston Purina Co. v. General Foods Corp.,* 442 F.2d 389, 390 (8th Cir.1971) ("presumption of validity is weakened, if not completely destroyed, by proof of pertinent prior non-considered art").

Recognizing the presumption of validity, we must satisfy ourselves in light of the evidence before us that the patents in suit possess the essential characteristics of utility, novelty and nonobviousness. *United States v. Adams,* 383 U.S. 39, 48, 86 S.Ct. 708, 712–13, 15 L.Ed.2d 572 (1966); *Clark Equipment Co. v. Keller,* 570 F.2d at 785. Since CPI has urged lack of novelty (anticipation) and obviousness as bases for invalidity, placing particular emphasis on obviousness, it is these aspects of the patents that we will examine. Before proceeding further, it is relevant for purposes of determining invalidity that the Greatbatch and Wingrove patents comprise elements or techniques that were known in the prior art. As such they are combination patents whose elements presumptively were combined in an inventive manner so as to render the combination patentable.[1]

■ The requirement of novelty or non-anticipation derives from 35 U.S.C. § 102. If the claimed invention was known, used, patented or described in a printed publication before the date of the invention or more than one year before the date of application for patent, the invention is not novel. 35 U.S.C. § 102(a), (b).

*See Sakraida v. Ag Pro, Inc.,* 425 U.S. 273, 281, 96 S.Ct. 1532, 1537, 47 L.Ed.2d 784 (1976); *Great Atlantic & Pacific Tea Co. v. Supermarket Equip. Corp.,* 340 U.S. 147, 150–52, 71 S.Ct. 127, 129–30, 95 L.Ed. 162 (1950); *Reinke Mfg. Co. v. Sidney Mfg. Corp.,* 594 F.2d 644, 648 (8th Cir.1979).

---

1. While it has been observed that virtually all inventions combine elements whose properties or uses were known in the prior art, *see, e.g., Square Liner 360°, Inc. v. Chisum,* 691 F.2d 362, 369 (8th Cir.1983), courts nevertheless refer to inventions that employ old elements as combinations and afford them special scrutiny.

■ When a combination patent is challenged, the test for anticipation is whether the prior art discloses all of the elements of the claimed combination, or their mechanical equivalents, functioning in substantially the same way to produce the same result. *Greening Nursery Co. v. J & R Tool & Mfg. Co.,* 376 F.2d 738, 740 (8th Cir.1967). It is the totality of the combined elements that is important. Even though no single element is new, if the combination is new and it performs or produces a new or different function or operation, the invention is novel. *Lincoln Engineering Co. v. Stewart-Warner Corp.,* 303 U.S. 545, 549, 58 S.Ct. 662, 664, 82 L.Ed. 1008 (1938); *Maloney-Crawford Tank Corp. v. Sauder Tank Co.,* 465 F.2d 1356, 1366 (10th Cir.1972); *Gruendler Crusher & Pulverizer Co. v. Williams Crusher & Pulverizer Co.,* 496 F.Supp. 1385, 1388 (E.D.Mo.1980).

■ An invention found to be novel may nevertheless be invalid for reasons of obviousness. 35 U.S.C. § 103; *Reinke Mfg. Co. v. Sidney Mfg. Corp.,* 594 F.2d 644, 646 (8th Cir.1979); *L. & A. Prods. Inc. v. Britt Tech. Corp.,* 365 F.2d 83, 87 (8th Cir.1966); *Skee-Trainer, Inc. v. Garelick Mfg. Co.,* 361 F.2d 895, 899 (8th Cir.1966). If the improvements of the patented invention over the prior art at the time of invention would have been obvious to a person having ordinary skill in the pertinent art, the patent is invalid. 35 U.S.C. § 103. The United States Supreme Court has afforded guidance for determining Section 103 obviousness in *Graham v. John Deere Co.,* 383 U.S. 1, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966). According to *Graham,* factual inquiries must be made to ascertain (1) the scope and content of the prior art; (2) the differences between the patented device and the prior art at the time of invention; and (3) the level of ordinary skill in the art at the time of invention.[2] *Id.* at 17, 86 S.Ct. at 693–94; *Span-Deck, Inc. v. Fab-Con, Inc.,* 677 F.2d 1237, 1241 (8th Cir.1982).

In determining the scope of the prior art, the Supreme Court's observation in *Graham v. John Deere* is relevant to the present case. The Court there noted that

> Technology ... has advanced—and with remarkable rapidity in the last 50 years. Moreover, the ambit of applicable art in given fields of science has widened by disciplines unheard of half a century ago. It is but evenhanded application to require that those persons granted the benefit of a patent monopoly be charged with an awareness of these changed conditions.

383 U.S. at 19, 86 S.Ct. at 694–95. The Court made this statement in a 1966 case in which the patented device was a farm plow. The patents in suit involve electronic circuits, many of the components of which have been developed only within the last several decades. The body of electronics knowledge has grown prodigiously in this time and the ever-increasing complexity and expanding application of this knowledge is dumbfounding, especially to the layman.

■ In the present case it would be myopic to limit the scope of the prior art to prior cardiac pacemaker circuitry. Prior art includes not only earlier devices and publications of a particular area, but also includes similar devices whether or not in areas related to the patented device. *Skee-Trainer, Inc. v. Garelick Mfg. Co.,* 361 F.2d at 898. The scope of the prior art is defined by the nature of the problem confronting the would-be inventor. *Graham v. John Deere Co.,* 383 U.S. at 35, 86 S.Ct. at 702–03; *Republic Indus. v. Schlage Lock Co.,* 592 F.2d 963, 974–75 (7th Cir.1979). If the elements, purposes or techniques of other fields are relevant and useful to the problem solved by the patented device, those fields are analogous and should be considered within the scope of the prior art. *Mott Corp. v. Sunflower Indus.,* 314 F.2d 872, 878 (10th Cir.1963); *George J. Meyer*

---

**2.** The Court went on to say that commercial success might be utilized as a secondary consideration of obviousness. *Graham v. John Deere Co.,* 383 U.S. at 17, 86 S.Ct. at 693–94.

The parties in the instant case have stipulated that commercial success is not a consideration. Defendant's Exhibit 40.

*Mfg. Co. v. San Marino Electronics Corp.,* 422 F.2d 1285, 1288 (9th Cir.1970). The inventor is presumed to know and is chargeable with knowledge of all applicable prior art. *L.S. Donaldson Co. v. LaMaur, Inc.,* 299 F.2d 412, 420 (8th Cir.), *cert. denied,* 371 U.S. 815, 83 S.Ct. 27, 9 L.Ed.2d 57 (1962); *Michigan Magnetics, Inc. v. Nortronics Co.,* 245 F.Supp. 401, 403 (D.Minn.1965).

 Once the scope and content of the prior art are established, and the differences between the invention and the prior art are ascertained, the obviousness of the invention is measured by the knowledge of a hypothetical person skilled in the art who has thought about the subject matter of the patented invention in light of that art. *Flour City Architectural Metals v. Alpana Aluminum Prods., Inc.,* 454 F.2d 98, 108 (8th Cir.1972); *see Reinke Mfg. Co. v. Sidney Mfg. Corp.,* 594 F.2d at 652; *Republic Indus. v. Schlage Lock Co.,* 592 F.2d at 975. Improvements obvious to those skilled in the art are not entitled to protection. *Airlite Plastics Co. v. Plastilite Corp.,* 526 F.2d 1078, 1082 (8th Cir.1975), *cert. denied,* 425 U.S. 938, 96 S.Ct. 1671, 48 L.Ed.2d 179 (1976). With respect to combination patents, the Eighth Circuit has said that

> Courts should scrutinize combination patent claims with a care proportioned to the difficulty and improbability of finding invention in an assembly of old elements.... A patent for combination which only unites old elements with no change in their respective functions ... obviously withdraws what is already known into the field of its monopoly and diminishes the resources available to skillful men.

*Reinke Mfg. Co. v. Sidney Mfg. Corp.,* 594 F.2d at 648 (quoting *Sakraida v. Ag Pro, Inc.,* 425 U.S. 273, 281, 96 S.Ct. 1532, 1537, 47 L.Ed.2d 784 (1976), quoting *Great Atlantic & Pacific Tea Co. v. Supermarket Equip. Corp.,* 340 U.S. 147, 152–53, 71 S.Ct. 127, 129–30, 95 L.Ed. 162 (1950)).[3]

We examine the patents seriatum in light of these principles.

## II.

### A. Greatbatch

This invention, the earliest of the patents in suit, was conceived, breadboarded and reduced to practice on January 20, 1965. The purpose of the Greatbatch invention was to prevent the output rate of pacer pulses from exceeding a predetermined maximum safe rate. Prior to the time of the Greatbatch invention, the problem of uncontrolled increase of pacer pulse rate, commonly referred to as pacer runaway, was well known. Such runaway could be caused either by the heart itself or by pacer malfunction, depending on the type of pacer.

There are three general types of pacemakers: synchronous, asynchronous and demand. A synchronous pacemaker stimulates the heart in synchrony with the physiological pulse beat of the heart. A synchronous pacer senses the natural pulse of the atrium of the heart and correspondingly provides a delayed but amplified pulse to the ventricle of the heart.

An asychronous pacemaker artificially stimulates the heart independent of the heart's natural pulse beat. An asynchronous pacer is set at a predetermined pulse rate and it stimulates the ventricle at this preset rate regardless of the natural atrial pulse rate. The runaway inhibited pacemaker disclosed in the Greatbatch patent is an asynchronous pacemaker.

A demand pacemaker is programmed to artificially stimulate the heart only when the heart "demands" assistance. A demand pacer senses the natural pulse beat of the heart and will lie dormant while the heart naturally beats above a predetermined rate.

---

**3.** Analysis of combination patents often leads to a search for synergism. *See, e.g., Saikraida v. Ag Pro, Inc.,* 425 U.S. 273, 282, 96 S.Ct. 1532, 1537, 47 L.Ed.2d 784 (1976); *Reinke Mfg. Co. v. Sidney Mfg. Corp.,* 594 F.2d 644, 648 (8th Cir. 1979). However, as discussed in *Republic In-* *dus., Inc. v. Schlage Lock Co.,* 592 F.2d 963 (7th Cir.1979), synergism is not required by 35 U.S.C. § 103, and we therefore have not analyzed the combination patents in suit for synergistic effect.

When the natural pulse falls below the predetermined rate, the demand pacer is activated to artificially stimulate the heart asynchronously at a present rate.

Each of these three types of pacers is susceptible to runaway. Unique to synchronous pacers is runaway stimulated by the heart itself. Should the atrium of the heart fibrillate, the pacer would sense the increased but irregular activity of the atrium and attempt to stimulate the ventricle accordingly. Another cause of runaway is pacer malfunction. Battery failure or other component failure caused by body fluid or vapor moisture entering the pacer are two examples of runaway-causing malfunctions.

Plaintiffs assert that before Mr. Greatbatch developed his runaway inhibiting system, the practice was to discover the malfunction that caused runaway and to use fail safe techniques to prevent that particular malfunction in the future. The Greatbatch invention provides "universal" runaway protection by means of a runaway inhibit circuit that is separate and independent from the main body of the pacer circuitry. In simple terms, the Greatbatch runaway inhibit system controls the egress rather than the cause of runaway pacer pulses. Whatever the cause of increased rate,[4] a separate circuit controls output.

The Greatbatch patent discloses two embodiments of the patented runaway inhibiting system. The runaway inhibiting circuit in Figure 1 of the Greatbatch patent reduces the amplitude (intensity) of the pacer pulses as rate of the pulses approaches a predetermined upper rate limit. As the rate runs away toward the upper limit, the intensity of the pulses gradually diminishes to a point that the heart is no longer stimulated by the output pulse. Before the rate actually reaches the upper limit, the runaway inhibiter of Figure 1 reduces pulse intensity to zero, thereby providing no artificial stimulation whatsoever to the heart.

Figure 2 of the Greatbatch patent discloses a runaway inhibit means which inhibits runaway by stopping pulses at the point of output. There is no reduction of the intensity of the output pulses. The runaway inhibiting circuit of Figure 2 controls excess rate by means of a timing constant that is separate from, though responsive to, the rate of the pulse generator. When the pulse generator runs away, the timing constant of the runaway inhibiter blocks the output of pulses such that the pulses which reach the heart exit the pacer at a rate no higher than a second predetermined rate. As the rate of runaway increases, the blocking of pulses by the timing constant correspondingly increases.

Plaintiffs assert that Mr. Greatbatch's design of a runaway inhibit system, which operated independently of the pulse generator and which was therefore unaffected by sundry pacer malfunctions that caused the pulse generator to runaway, was different from previous pacers with runaway protection means and was unobvious to persons skilled in the art, even though they agree that none of the components of the Greatbatch patent was invented or developed by Mr. Greatbatch.

### 1. *Novelty*

Addressing first the question of novelty of the Greatbatch invention, we are a bit uncertain about which prior device defendant believes anticipated Greatbatch. Defendant introduced much evidence showing that the various components and functions of the Greatbatch device were known in the prior art. However, defendant presented no single device or disclosure as being anticipatory of Greatbatch as a whole. United States Patent No. 3,253,596 to Keller (Keller '596),[5] which disclosed a cardiac pacer that used rate division capable of limiting rate runaway in both synchronous and asynchronous operation, did not disclose rate limiting protection inde-

---

**4.** The Greatbatch patent did not inhibit all forms of runaway. For example, a malfunction in the runaway inhibiting circuit itself might cause runaway.

**5.** Filed May 27, 1963; issued May 31, 1966. Keller '596 was referenced in the Greatbatch patent.

pendent of the pulse generator. For this reason Keller '596 did not anticipate the runaway inhibit means of Greatbatch.

United States Patents Nos. 3,187,202 to Case,[6] and 3,299,295 to Goda [7] also disclose pulse controlling circuitry. Case describes a circuit which limits pulse rate by monitoring pulse density. When incoming pulses of whatever density exceed a predetermined maximum average rate, the Case invention, similar to the circuit embodied in Figure 2 and described in Claims 8 and 12 of Greatbatch, blocks the passage of pulses such that the output does not exceed a predetermined maximum rate. Goda describes a circuit which, similar to the circuit embodied in Figure 1 of Greatbatch, controls pulse output by reducing the width (duration) and rate of pulses entering the circuit beyond a predetermined pulse width or rate.

Neither Case or Goda is a cardiac pacemaker. They do not have pulse generators and therefore do not have runaway inhibit means coupled to a pulse generator as described in Claim 1 of Greatbatch.[8] Because of these differences, we find that neither Case nor Goda anticipated Greatbatch.

Finally, defendant suggested that a Medtronic advertisement, Defendant's Exhibit 24, which appeared in 1962, anticipates every element of the Greatbatch invention. The advertisement announces a pacemaker circuit which prevents "the rate of the Pacemakers from ever increasing beyond a rate of 90—regardless if it is caused by battery expiration or the complete failure of an entire cell." While this statement clearly suggests the undesirability of rate increase, it appears under a subheading discussing the battery characteristics of the advertised pacemaker and mentions only two battery-related causes of rate increase. The advertisement discloses no technological description of the circuit nor does the circuit purport to independently inhibit runaway induced by component failure. For these reasons, we find that the advertise-

ment did not anticipate Greatbatch. *See Collins v. Owen,* 310 F.2d 884, 887 (8th Cir.1962).

In short, we find that Greatbatch's runaway inhibit system was not anticipated.

### 2. *Obviousness*

■ The first step in determining obviousness is to ascertain the scope and content of the prior art. The scope of art for the Greatbatch patent includes pulse controlling circuitry within and without the cardiac pacemaker field. Any prior art that teaches methods or techniques for controlling pulse parameters is relevant to the problem which the Greatbatch patent sought to resolve.

The pertinent prior art appears to include the Keller '596 and Case patents. Both of these prior art patents teach rate-limiting circuitry that used a time constant to block pulses and inhibit the rate of pulse output from exceeding a predetermined maximum rate. They do not, however, teach the independence of the rate-limiting means which appears to be the essence of the Greatbatch invention.

Two advertisements, the Medtronic ad discussed above, and one for an Electrodyne cardiac pacemaker, Defendant's Exhibit 20, indicate the advisability of runaway inhibit means that protect or act as a safeguard against pacer runaway caused by battery failure. At best these two advertisements merely suggest the advantages of situating the runaway inhibiter apart from the pulse generator so as to be unaffected by runaway-inducing pacer malfunctions.

The difference between this prior art and knowledge and the Greatbatch runaway inhibit system is the independence of Greatbatch's runaway inhibiter. When pulsing asynchronously, the Keller '596 rate-limiting circuit was not separate from the pulse generator and therefore was not immune to

---

**6.** Filed October 25, 1962; issued June 1, 1965.

**7.** Filed December 7, 1964; issued January 17, 1967.

**8.** Case and Goda were designed to monitor chains of pulses rather than individual pulses to limit the average rate of pulses passing through the device.

component failure in the pulse generator. Case and Goda were not pacemakers and therefore had no pulse generator from which to be independent. They simply controlled chains of pulses originating from sources outside the device.

The level of ordinary skill in the electronic pulse control art was high in 1964–1965. A minimum of a bachelor's degree in electrical engineering often accompanied by a master's degree and several years of design experience were not uncommon. A hypothetical person of ordinary skill in the art would have had a broad and relatively in-depth knowledge of electronics in general.

If a hypothetical person skilled in the art addressed himself to the problem of controlling pacer stimulation of the heart above safe rates, he certainly would look to the Keller '596 means for inhibiting runaway and, if he thought about the runaway inhibiter independence suggested by the Medtronic and Electrodyne advertisements and understood that runaway was caused by component malfunction as well as battery malfunction, he could see the usefulness of the rate-limiting techniques taught in Case and Goda which were completely independent of the pulse generating source.[9]

The ultimate question of the validity of the Greatbatch patent comes down to whether the placement of the runaway inhibit means apart from the pulse generator was obvious. It seems to us that there were two obvious methods of controlling rate runaway. Plaintiff's expert testified that in his opinion, the obvious solution would have been to enhance the reliability of the individual components whose failures were causing runaway. We agree that this was one obvious method of inhibiting malfunction-induced runaway. It does not seem extraordinary, however, especially in light of the sundry and, presumably, often unforeseen causes of runaway-inducing malfunctions, that the other obvious solution was to place the runaway inhibit

means at the point of pulse output, independent of the pulse generator and its components.

Accordingly, we find that Greatbatch's runaway inhibit system is invalid for reasons of obviousness and that claims 1, 8, 10, 11, and 12 are not infringed.

### B. *Wingrove*

This invention teaches a remotely programmable, digitally timed and controlled electromedical stimulation apparatus. Mr. Wingrove developed a prototype of this apparatus in 1970 and filed his application for patent on July 26, 1971. Mr. Wingrove's purpose was to make an implantable pacemaker that had remotely (noninvasively) programmable pulse parameters. Mr. Wingrove wanted to avoid previous "mechanical" methods for reprogramming implanted pacers. Such mechanical methods included the invasive Keith needle and the application of a magnetic field from outside the body to alter the state of bi-stable reed switches in an implanted pacer. Mr. Wingrove used radio frequency signals, with which he was familiar, as his noninvasive means of reprogramming.

Plaintiffs argue that the novelty and, more importantly, the nonobviousness of the Wingrove invention lie in Mr. Wingrove's combined use of digital circuitry, particularly digital two counter architecture, and coded radio signals. As with the Greatbatch invention, all of the elements of the Wingrove invention were known in the prior art. The validity of this invention therefore rests on the presumed novelty and nonobviousness of the combination of its known elements.

### 1. *Novelty*

Neither the plaintiffs or Mr. Wingrove contend that digital circuitry, digital two counter architecture or coded radio signals were invented by Mr. Wingrove. Before the mid 1960's analog circuitry was the rule

---

**9.** Plaintiffs noted the inherent restrictions of implantable cardiac pacers and emphasized the need to avoid hindsight reconstruction of Greatbatch and the other patents in suit. We appreciate this information and we have attempted to analyze the validity of these patents with foresight from the time the inventions were made.

in pacer design. Digital circuitry had been used primarily in computer science but its use in cardiac pacing devices was being advocated and was slowly being adopted by the mid to late 1960's.

The advantages of miniaturized digital circuitry over analog circuitry in pacers were set forth in a 1966 article by Walsh & Moore, Defendant's Exhibit 8, and in United States Patent No. 3,557,796 to Keller et al. (Keller '796).[10] These advantages included lower power consumption, greater versatility of use, improved reliability, and less hand assembly. The Keller '796 patent, which used digital circuitry in a digital counter driven pacer, urged the substitution of digital for analog circuitry in pacer design.

Digital two counter architecture is the use of two counters or binary storage means to control the rate of output pulses. As described in Wingrove, the first counter, called the set counter, receives information from a remote, noninvasive source (here a radio frequency transmitter); the second counter, which is called the clock counter and is driven by a crystal oscillator clock, counts up information with each clock tick. A comparator connected to the two counters, upon finding a match between the information stored in the counters, issues an output signal which triggers a pacer output pulse to the heart. This process of controlling rate has been referred to as programmable frequency division because the rate of pulse output is equal to the frequency of the oscillator divided by the number programmed into the set counter. Digital two counter architecture similar to that used in Wingrove had been previously disclosed in United States Patents Nos. 3,622,987 to Borkan[11] and 3,537,003 to Planta and Stebler.[12]

The first counter in Wingrove's invention responds to encoded radio signals transmitted from outside the body. The radio re-

ceiver in the pacer, upon decoding the signal, identifies the signal as a true command to reprogram the first counter. By making the first counter sensitive only to properly encoded signals, the pacer is protected against inadvertent reprogramming by extraneous, ambient signals.

The use of an encoding transmitter and a decoding receiver, called an obvious safety precaution by Mr. Wingrove, had been recognized before Mr. Wingrove filed his patent. For example, United States Patent No. 3,445,815 to Saltzberg and Terry[13] taught the use of coded signals to guard against false operation from noise or other interference. Defendant also introduced a 1969 article entitled "Basics: Remote Radio Controls," Defendant's Exhibit 4, which describes without technical detail an encoding transmitter and a decoding receiver of remote control radio frequency signals. This article noted the obvious need for a receiver that would be responsive only to intended remote control signals.

 Thus digital two counter architecture and coded radio signals were known in prior electronics art. However, defendant offered no single device that combined the use of these two techniques in a fashion that performed the same function or operation as Wingrove. Based on the evidence before us we find that Mr. Wingrove's use of digital two counter architecture to achieve programmable frequency division in a cardiac pacer and his use of coded radio signals as the means of remotely programming that pacer was a novel combination of those components.

2. *Obviousness*

 The more difficult question is whether or not the Wingrove combination would have flowed naturally from the prior art or been obvious to a person skilled in the art who had thought about the subject matter of the invention in light of the art.

---

10. Filed March 10, 1969; issued January 26, 1971.

11. Filed May 8, 1969; issued November 23, 1971.

12. Filed April 22, 1968; issued October 27, 1970.

13. Filed September 27, 1965; issued May 20, 1969.

Using the *Graham v. John Deere* methodology we first ascertain the scope of the prior art. As noted above, the nature of the problem confronting the would-be inventor dictates the scope of the prior art. Here, the problem facing the inventor was that of finding a reliable means of pulse generation that could be remotely programmed. The general area of prior art relevant to this problem is electronics, and digital circuitry as used in pacing devices, including digital two counter architecture, is especially relevant. In addition, prior developments in remote radio control are pertinent to a determination of the obviousness of the Wingrove invention.

The differences between Wingrove and the prior art boil down to the use of digital two counter architecture to control the rate of pulse generation in a cardiac pacer. As stated, remote control by use of coded radio frequency was known in the prior art. The Wingrove patent examiner referenced four prior art patents: Keller '796, United States Patent Nos. 3,629,710 to Durland, 3,631,860 to Lopin, and 3,662,758 to Glover. The Keller '796 patent disclosed a pacer that controlled rate by means of a digital counter driven by an oscillator. The importance of Keller '796 with regard to the Wingrove device was Keller's recognition of the advantages and use of miniaturized integrated digital circuits, including a digital clock time base, in an implantable cardiac pacer. The rate of the Keller '796 pacer was neither variable or programmable.

The Durland patent referenced by the Wingrove examiner disclosed a pulse generator, not a cardiac pacer, that used digital two counter architecture to control duty cycle [14] rather than rate. Durland's timing or clock counter was driven by a 60hz line frequency rather than by an oscillator or other clock means internal to the device. Durland was not remotely programmable.

The Lopin patent referenced by the Wingrove examiner disclosed an implantable cardiac pacer whose rate could be remotely varied to selected prefixed rates by means of a digital counter. Lopin had no internal clock and its rate was not controlled by digital two counter architecture. Lopin used a resistor-capacitor time constant (an analog approach) to time the pacer.

Finally, the Wingrove examiner also referenced the Glover patent which disclosed an implantable stimulator apparatus that was remotely programmable by means of a radio frequency transmitter and receiver.

Defendant contends that other prior art not referenced by the Wingrove examiner would have been useful in assessing the nonobviousness of the Wingrove device. Specifically, defendant argues that United States Patent No. 3,537,003 to Planta is much closer to Wingrove's rate-controlling, digitally-timed two counter architecture than was Durland, the only referenced prior art disclosing programmable frequency division. In addition, defendant argues that the Walsh & Moore article described programmable frequency division similar to that used in Wingrove.

Planta was a frequency measuring apparatus which, when utilized to measure a person's pulse, sensed by means of its input "measuring" counter the time interval between individual heart beats, and then by means of its "computing" counter counted up the high frequency ticks of its oscillator clock. Because of the stability and high frequency of the oscillator, the time interval between individual heart beats was ascertained and the pulse rate per minute, based on the time interval between two individual pulse beats, was computed and digitally displayed.[15]

The Walsh & Moore article, entitled "Digital Timing Unit for Programming Biological Stimulators," presented an external pulse generating device whose rate could be

---

**14.** In this context, duty cycle means the ratio of pulse width (the time the pulse is being generated) to pulse interval (the time that the pulse is not being generated).

**15.** Planta was reprogrammable in the sense that the measuring counter is continually receiving new and varying inputs because the time interval between individual pulses is continually changing.

"reprogrammed" by manually resetting a bank of switches that controlled the interval between output pulses. The device described by Walsh & Moore used a stable, high frequency oscillator as its clock means and used a series of Beam-X tubes as its counter. The counter would count clock ticks until there was a match between the manually selected rate interval and the number of clock ticks counted. When a match occurred, an output pulse was initiated and the Beam-X tubes were reset to zero to start counting clock ticks anew until the next match.

The level of skill in the art of pacer design in the late 1960's to early 1970's was high, bachelor's and master's degrees in electrical engineering were common. Skill in digital circuitry was desirable and was becoming more sought after at that time. Indicative of the level of digital skill in pacer design is the Keller '796 patent for a "Digital Counter Driven Pacer" which assumed, in the field of cardiac pacer design, skill in the digital circuitry arts.

A hypothetical person skilled in the art of electronics, with experience in the area of electronic pulse generation, with design experience, and with skill in digital circuitry, faced with the task of developing a means of pulse generation that could be remotely programmed to control pulse rate in an implanted pacer would have been drawn to digital circuitry on the basis of its reliability alone in 1969. The inherent precision and reliability of digital two counter architecture to achieve frequency division would have been a method of timing rate that warranted examination. Indeed, the component parts of digital two counter architecture, namely a set counter, an oscillator, a clock driven counter, and a comparator, were available in packaged, ready-to-use form before Mr. Wingrove developed his pacer. High precision, reliable timing by means of frequency division was an obvious and expected application of these components.

While plaintiffs do not contend that Mr. Wingrove invented digital two counter architecture, they do assert that his use of this technique was not obvious. Plaintiffs emphasize that no one before Mr. Wingrove had used digital two counter architecture to achieve remotely programmable frequency division in an implantable cardiac pacer. This is true. Mr. Wingrove's application was novel but the important question is whether or not it was nonobvious.

As referenced by the Wingrove examiner, Keller '796 introduced the use of digital circuitry in an implantable pacer and Lopin showed a method of remotely programming the rate of an implanted pacer. Durland used digital two counter architecture to control duty cycle, not to achieve frequency division. Planta, not referenced in Wingrove, used digital two counter architecture to ascertain rate and Walsh & Moore, also not referenced in Wingrove, showed the use of comparison logic with an oscillator time base to control rate.

The teachings of Planta and Walsh & Moore are significant. Unlike the two counter architecture of Durland, Planta's two counter architecture used a comparator and relied on an internal clock means, an oscillator, to time rate rather than duty cycle. That Planta was not a pacing apparatus does not diminish the usefulness or importance of its teaching. As for Walsh & Moore's external biological stimulator, its rate timing function parallels that of Wingrove's implantable pacer in every respect. Walsh & Moore's resettable switch register bank parallels Wingrove's programmable set counter; Walsh & Moore's series of Beam-X tubes parallel Wingrove's clock counter; and, Walsh & Moore's oscillator time base parallels Wingrove oscillator time base.

We believe that one familiar with digital circuitry art, including digital two counter architecture, and aware of the teaching of Keller, Planta, Walsh & Moore, and Lopin, would have used digital two counter architecture as an obvious choice to achieve programmable frequency division in an implantable pacing device. It is noteworthy that Mr. Wingrove himself was not formally trained in digital circuit design and that he was not conversant with the prior art.

Accordingly Wingrove's remotely programmable, digitally timed and controlled pacer is invalid for reasons of obviousness and Claims 1, 4, 5, 7, 8, 9, 10, and 23 are not infringed.

## C. *Walmsley*

 The third patent in suit teaches a digital battery-sensing circuit which indicates significant depletion of battery strength by abruptly lowering the rate of output pulses. Mr. Walmsley started his work on the project that produced this circuit in September 1970. The application for patent was originally filed in January 1972. Mr. Walmsley's purpose in designing a circuit that abruptly rather than gradually changed pacer pulse rate was to provide a method of clearly indicating significant battery depletion and to enable the patient himself to detect the decrease in power.

Decrease in pulse rate as an indicator of battery depletion was common in pacer design before Mr. Walmsley began his work. *E.g.*, United States Patent No. 3,474,353 to Keller (Keller '353).[16] The difference between Walmsley's battery sensor and that used in prior pacers can be traced to the differences between digital and analog circuitry. The earlier battery sensing circuits used an analog approach that decreased rate gradually in direct relation to the gradual loss of battery power over a period of time. Monitoring battery condition by directly correlating it to pacer pulse rate proved to be unsatisfactory because gradual changes in rate were not easily perceived and depletion of battery power was not predictable.

The Walmsley device shows a pacer that has two discrete, fixed (within a tolerance) rates of pulse output. The first predetermined fixed rate, referred to as the normal rate, is the rate the pacer pulses at when the battery[17] is new. The pacer paces steadily at its normal rate as the battery depletes. When the battery voltage drops below a predetermined level, the pacer abruptly begins steadily pacing at a second predetermined rate, typically 10% slower than the normal rate. The sudden change in pulse rate is a clear indicator to the patient or doctor that the battery is nearing the end of its life and that it should be replaced.

Defendant argues that the Walmsley patent is invalid for obviousness. Defendant contends that battery sensing circuits were commonplace before Walmsley and that with the advent of digital circuitry and its use in cardiac pacer design, a digital battery sensing circuit with a step-down rate change indicator of battery depletion was a natural and obvious development.

*Obviousness*

The scope and content of the prior art are defined by the problem facing the would-be inventor. The problem Mr. Walmsley faced was that of finding a method of clearly indicating a significant loss of battery voltage in a cardiac pacer. Previous methods of sensing loss of battery voltage within and without the field of cardiac pacer design would be relevant prior art.

In addition to prior art that taught continuous gradual rate change as an indication of battery depletion, two pieces of prior art not referenced by the Walmsley examiner were introduced by the defendant. The first, a 1969 article by Hans Thornander, Defendant's Exhibit 14, described an asynchronous pacer with a rate-stable oscillator whose rate, by addition of a nonlinear element, could be rendered voltage sensitive such that gradual depletion of the battery was reflected by a gradual decrease in pacer pulse rate. Also introduced by defendant was United States Patent No. 3,503,602 to Witzke and Johannson.[18] The Witzke

---

**16.** Filed January 4, 1968; issued October 21, 1969. Keller '353 was referenced by the Walmsley examiner.

**17.** When Mr. Walmsley began working on his device the typical power source was a stack of mercury/zinc cells. By the mid 1970's single cell lithium batteries became more common. The Walmsley device works with either type of battery.

**18.** Filed November 12, 1965; issued March 24, 1970.

patent disclosed a voltage level indicator, not a cardiac pacer. Upon a predetermined drop in voltage, the Witzke device warned of the lower voltage level by means of a flashing light which otherwise appeared to be constantly lit before the requisite drop in voltage.

The difference between the Walmsley device and the prior art is simply step-like rate change as opposed to continuous rate change as an indicator of battery depletion. As for the level of skill in the art, as stated, the level of ordinary skill in the art of pacer design was high in the late 1960's to early 1970's. Design experience with digital circuitry, in addition to at least a bachelor's degree in electrical engineering, was expected and common.

One skilled in the art of pacer design, familiar with relevant prior art in the areas of cardiac pacing and battery sensing circuits, would have been knowledgeable of previous methods of continuous rate change battery sensing circuits in pacers and would have had knowledge of digital circuitry and the characteristics of rate-stable oscillator time bases. Looking at the differences between prior art such as Keller '353, which used a resistor-capacitor time constant and indicated battery depletion by continuous rate change, and Thornander, which used a rate-stable oscillator as a time base but employed a nonlinear element to allow for continuous rate change to indicate battery depletion, one might contemplate the use of a step-like change of rate simply because of the discrete-state nature of digital circuits. The fact that analog circuitry and continuous rate change were the popular choice in pacer design during the 1960's explains the general inertia in the transition from analog to digital circuitry but does not detract from the obviousness of step-like rate change in a digitally timed pacer.

Moreover, the importance of the Witzke patent, which taught step-like indication of battery depletion, is enhanced in view of the history of the prosecution of the Walmsley patent. The Walmsley patent examiner had originally rejected Walms-

ley's application because United States Patent No. 3,486,071 to Hedge[19] taught a circuit that continuously monitored battery voltage such that the time during which an inductor was permitted to charge increased as battery voltage decreased. To distinguish Walmsley from Hedge, Walmsley was amended to reflect the fact that Walmsley's voltage sensing circuit responded only to a significant, predetermined drop in voltage. As stated by the attorney who prosecuted the Walmsley application:

> The Examiner ... was particularly concerned with the fact Hedge, though a supply circuit rather than the pacemaker circuit of applicant's invention, would sense decreases in the supply voltage. It was explained that while Hedge is a circuit for continually responding to change in voltage, applicant's circuit responds to one predetermined change in voltage. To help in clearly defining over Hedge, the Examiner and applicant's attorneys agreed that by changing the claim language to require that applicant's circuit respond to a significant voltage change the claims would be allowable over Hedge.

Plaintiff's Exhibit 8, Amendment Remarks pp. 4–5. A battery sensing circuit that responded only to a predetermined significant drop in voltage is what Witzke teaches. The examiner's failure to consider Witzke and Thornander greatly weakens the presumed validity and the presumed nonobviousness of Walmsley.

We find that Walmsley's step-rate change battery sensing circuit would have been obvious at the time of invention to a person of ordinary skill in the art. The Walmsley patent is therefore invalid for reasons of obviousness and Claim 13 is not infringed.

### III

In summary, we find that United States Patents Nos. 3,391,697 to Greatbatch, 3,833,005 to Wingrove, and 3,901,247 to Walmsley are invalid and not infringed. Plaintiffs'

**19.** Filed June 28, 1968; issued December 23, 1969.

claim for attorney fees and costs and defendant's claim for attorneys fees and costs are DENIED.

Let judgment be entered accordingly.